No. 90-065

IN THE SUPREME COURT OF THE STATE OF MONTANA

1991

THE STATE OF MONTANA

      Plaintiff and Respondent,

  -v-

PHILIP SADOWSKI,

      Defendant and Appellant.

APPEAL FROM:  District Court of the Eighteenth Judicial District,
In and for the County of Gallatin,
The Honorable Thomas A. Olson, Judge presiding.

COUNSEL OF RECORD:

      For Appellant:

            Philip F. Walsh; Lineberger & Walsh; Bozeman, Montana
            Stephen D. Roberts, Bozeman, Montana

      For Respondent:

            Marc Racicot, Attorney General, Helena, Montana
            Patti Powell, Asst. Atty. General, Helena, Montana
            A. Michael Salvagni, County Attorney, Bozeman, Montana

Submitted on Briefs:  October 26, 1990

Decided:  January 28, 1991

Filed:

Clerk

Justice R. C. McDonough delivered the Opinion of the Court.

The defendant Philip Sadowski appeals the judgment and verdict of the Montana Eighteenth Judicial District Court, Gallatin County convicting him of the offense of deliberate homicide for the shooting of Robert Hare, pursuant to § 45-5-102, MCA. The Court sentenced Sadowski to forty years in the Montana State Prison for the deliberate homicide conviction plus ten years consecutively for the use of a weapon and declared the defendant ineligible for parole for 17 years. We affirm.

Sadowski presents three issues for review on this appeal:

1) Did the District Court err in denying the defendant's motion in limine and admitting over the defendant's continuing objection evidence of uncharged prior misconduct by the defendant?

2) Was it plain reversible error for the prosecutor to allegedly comment upon and emphasize, as well as cross-examine the defendant concerning the defendant's post-arrest silence after the defendant had received his Miranda warnings?

3) Was it reversible error for the investigating police officers not to take into evidence allegedly crucial items that may have been weapons used by the victim that would support the defendant's affirmative defense of justifiable use of force?

The facts in this case, except those facts immediately surrounding the shooting of Robert Hare, are largely undisputed. The defendant Philip Sadowski, operated a furniture restoration and repair business called the Furniture Doctor in Gallatin County near

Four Corners, approximately eight miles west of Bozeman. The business was located in a workshop which connected with his residence. On April 14, 1989, Sadowski and his cousin, Sid Warburton, who was visiting from California, delivered an antique backbar to some customers in Pray, Montana. Sadowski and Warburton returned to Four Corners and had dinner at the Korner Restaurant and then proceeded to the Korner Club Bar at about 8 p.m. where they played pool and drank beer until closing. During this time, Sadowski met Frank "Hawk" McKinnis and his girlfriend Lynn Bell. Sadowski did not know either McKinnis or Bell prior to striking up a conversation with them at the bar. McKinnis and Sadowski talked about woodworking. McKinnis stated that he didn't have access to good woodworking tools and Sadowski told him he had a full woodworking shop, and that they could stop by after closing to have a drink and look around Sadowski's shop.

Sadowski, Warburton, McKinnis, and Bell arrived at Sadowski's house at approximately 2:15 a.m. The deceased, Robert Hare, arrived by himself soon afterward. Sadowski had not met Hare prior to Hare knocking on the door and walking into the Furniture Doctor building. However, Bell introduced Hare as a friend, and Sadowski allowed him in.

Once in the shop, the five people drank and talked. Admittedly, everyone present was intoxicated. Sadowski and McKinnis conversed separately from the others as their attentions were focused primarily on woodworking and the designs that McKinnis

was cutting from pieces of wood with Sadowski's band saw. Bell, Warburton, and Hare talked with one another on the other side of the shop.

At about 3:30 a.m. McKinnis asked Sadowski if he could see his stock of wood, which was located just outside the main room of the shop. While Sadowski and McKinnis looked at the wood, in the other room they heard Sadowski's cousin Warburton yelling, "They're hurting me!" Sadowski and McKinnis then went back into the shop and saw Warburton with Hare and Bell near the door to the tool room. Sadowski testified that he thought this incident was odd because he had never seen his cousin behave that way, but he did nothing. He testified that he was concerned but he passed the incident off, and returned to the other side of the shop when McKinnis called him back to where he was working.

According to Sadowski's testimony, McKinnis later asked Sadowski to go into his living quarters to get more beer. While Sadowski was in the living quarters, getting the beer, and was out of sight but within hearing distance of the people in the workshop area, he heard his cousin complain of being hurt again. Sadowski testified that he became concerned at this time that perhaps a robbery would take place by these strangers he had invited into his home. He testified that he felt that he needed to be prepared should something happen, so he went into his bedroom, got his revolver and placed it in his belt in the back of his pants.

At this point the testimony is in dispute. Sadowski testified

4

that upon returning to the shop he saw his cousin and Lynn Bell kissing, announce that they were going to get some beer, and walk out of the shop into the apartment area. Sadowski testified that because McKinnis and Bell appeared to be a couple and McKinnis was turned at the band saw and hadn't seen what happened, Sadowski turned to Rob Hare and asked, "What's going on out there?" Sadowski testified that upon asking this, Hare became very animated, started swinging his hand around, and said "Well, you know what's going on out there. She's sort of jerking him around and this is how we get our power." Defendant testified that he was very frightened at Rob Hare's comment, wondering if they were planning a robbery or perhaps belonged to a cult. Sadowski testified that when he asked Rob Hare "What the hell do you mean by that?" Hare allegedly responded, "Well, that's just what we do."

Sadowski then testified that he pulled his gun out, held it in front of him without pointing it and said to Hare, "Look, I don't know what the hell's going on at this point, but I want you to. . . ." and that he was going to tell everyone to leave.

Hare allegedly replied "Oh, you can't stop me with that," meaning Sadowski's gun. Sadowski claimed to have backed up, asking Hare to not come any closer, but Hare allegedly continued to approach him yelling, "You can't stop me!" Sadowski testified that he got no response from McKinnis when he asked him to stop Hare. Hare allegedly kept approaching Sadowski, raised his right hand up,

had his left hand out in front of him, crouched, and moved quickly, looking as if he were going to hurl himself at Sadowski. Sadowski testified that when he felt he could retreat no more and that Hare would be upon him, he raised his gun up, aimed it at Hare's chest and shot him.

Hawk McKinnis's version of the shooting differs substantially. He testified that he turned off the band saw and turned around and saw Hare standing by the entrance to the shop ten to twelve feet from Sadowski. He testified that he heard defendant and Rob Hare in a low, regular, conversation, after which he heard defendant tell Rob Hare he was "tired of his bullshit" and then saw Sadowski level a pistol at and shoot Hare. He testified that Hare was standing in an upright position when shot. McKinnis testified that Sadowski then pointed the pistol at him and he told Sadowski that if he was going to shoot him, "he should do a good job of it or call the police." Sadowski telephoned the police and requested an ambulance immediately after the shooting. When officers arrived at the scene, Sadowski identified himself as the one who shot Hare, and officers then placed him under arrest and read him his Miranda rights. Rob Hare was taken to the hospital where he was pronounced dead.

At trial, Sadowski acknowledged that he had purposely or knowingly caused the death of Rob Hare and asserted as his sole defense that he was justified in shooting Hare because Hare was attacking him. Prior to trial, the state gave notice of its

intention to "introduce at trial evidence of other acts to show intent, knowledge, opportunity and absence of mistake or accident" pursuant to State v. Just (1979), 184 Mont. 262, 602 P.2d 957. The trial court denied Sadowski's motion in limine on prior acts evidence.

The evidence presented by both sides in the four day trial was extensive. Forensic scientists testified that the bullet traveled downward through Rob Hare's body at a thirty degree angle and that this was inconsistent with the victim being in an upright position at the time of the shooting. Hawk McKinnis' credibility was placed at issue throughout the trial, and as the only eyewitness, his testimony contradicted Sadowski's. Evidence of the victim's character for aggressiveness while intoxicated was introduced by the defense and rebutted with evidence by the prosecution. Thirty-one witnesses in all testified. Sadowski's cousin, Sid Warburton, although subpoenaed and listed as a witness by both the defense and the prosecution, did not testify. The jurors were allowed a view of the crime scene. After deliberation, the jury found Sadowski guilty of the offense of deliberate homicide, to which Sadowski now appeals. More specific facts will be developed in the discussion of Sadowski's issues on appeal as needed.

I.

As his first issue, Sadowski alleges that the District Court erred in admitting evidence of a past incident of misconduct where

7

Sadowski admittedly pointed a gun at a deputy sheriff two years and eight months prior to the homicide. Our standard of review relating to such evidentiary rulings is to determine whether in admitting the evidence the District Court abused its discretion. Steer, Inc. v. Dept. of Revenue (Mont. 1990), ___ P.2d ___, ___, 47 St.Rep. 2199, 2200. The District Court has broad discretion to determine whether or not evidence is relevant. Absent a showing that the District Court has abused its discretion, this Court will not overturn the District Court's determination of relevancy. State v. Oman (1985), 218 Mont. 260, 264, 707 P.2d 1117, 1119-1120. In the prior incident Sadowski had been having marital problems and phoned the sheriff's office and informed them that he was going to shoot himself. Deputy Campbell came to Sadowski's residence and Sadowski informed him that his marriage was breaking up and that was the cause of his distress. Deputy Campbell talked with Sadowski for approximately two and a half hours until Sadowski's wife came home. As Deputy Campbell talked to her, Sadowski got up from the couch and pointed a gun at him, allegedly stating that he now had control over the situation rather than Campbell. Deputy Campbell ducked behind the bookcase and crawled backwards out of the house. He testified that once outside he looked in the window and observed Sadowski first point the gun at his own head and then give the gun to his wife, who came out and gave the gun to Campbell. Sadowski was then arrested and placed in protective custody but was not charged with a crime.

After receiving the State's <u>Just</u> notice the District Court ruled on the defendant's motion in limine to bar admission of this incident:

> the central issue to be decided in this matter is whether the Defendant lawfully used a firearm under a stressful situation, and the exceptions to the general rule which prohibit evidence of other acts of misconduct would allow the State to introduce such testimony to show intent or motive and to explain away accident or mistake. So it is the Court's ruling that an allegedly unlawful use of a firearm three years prior to this is relevant; the jury should hear about it to determine the manner in which the Defendant acted in the present condition.

The "exceptions" to the general rule that evidence of other crimes, wrongs or acts is inadmissible to prove a defendant's character referred to in the court's ruling are found at Rule 404(b), M.R.Evid. which provides:

> Other crimes, wrongs, acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

As with its federal counterpart, the Montana rule adopts an inclusionary rather than an exclusionary approach, that is, use of the word "may" indicates that the second sentence actually lists theories of relevant examples rather than exceptions. State v. Johns (Or. 1986), 725 P.2d 312, 319-320.

In addition to the requirements of Rule 404(b), other acts evidence should meet the procedural as well as substantive requirements set out by this Court in State v. Jensen (1969), 153 Mont. 233, 455 P.2d 631; and State v. Just (1979), 184 Mont. 262,

9

602 P.2d 957. The test of admissibility set forth in these cases is

(1) similarity of crimes or acts;

(2) nearness in time, _and_

(3) tendency to establish a common scheme, plan, or system; _and_

(4) the probative value of the evidence is not substantially outweighed by the prejudice to the defendant. (Emphasis in original.)

_Just_, 602 P.2d at 961. We recently summarized the current state of the _Just_ requirements in State v. Medina (Mont. 1990), 798 P.2d 1032, 47 St.Rep. 1832.

> In considering the first prong of the test, we have previously held that "prior acts need not be identical to the offense committed but be merely of 'sufficient similarity'" in order to comply with this first criteria. State v. Eiler, 762 P.2d at 216, quoting State v. Tecca, 220 Mont. 68, 714 P.2d 136 (1986). . . . .

> . . .

> With regard to nearness in time, each case must be examined in light of its unique set of facts. See State v. Hansen, 187 Mont. 91, 608 P.2d 1083 (1980), where we allowed two and one-half years; State v. Stroud, 210 Mont. 58, 683 P.2d 459 (1984), where we allowed three and one-half years; and State v. T.W., 220 Mont. 280, 715 P.2d 428 (1986), where we allowed four years when the facts indicated that defendant did not have a prior opportunity. . . . .

> . . .

> . . . A common scheme, plan, or system is indicated by other crimes evidence when, compared with the current charge, the crimes possess a unique similarity which supports a plan to carry out a scheme. _Just_, 602 P.2d at 961. . . . .

10

> Any evidence of other crimes will have prejudicial implications on the defendant. *Just*, 602 P.2d at 961. As a result this court adopted procedural safeguards to decrease these prejudicial implications. *Just*, 602 P.2d at 963-64. Although these procedural safeguards do alleviate some of the prejudice to the defendant, they still do not replace the court's ultimate task of weighing the probative value of the other crimes evidence against its prejudicial effect.

*Medina*, 798 P.2d at 1035-1036. In State v. T.W. (1986), 220 Mont. 280, 715 P.2d 428, this Court held that failure to meet one element of the *Just* formula was not enough to refuse admission of prior acts. "Admission of evidence cannot be denied solely on the fact that it was not too near in time to the incident in question. Factors other than mere lack of time must be determined by the circumstances of the case." T.W., 715 P.2d at 431. Here, although the crimes were not identical, they were like enough to meet the *Just* similarity criteria as well as fall within the boundaries of nearness in time. Furthermore, the trial court performed its function of balancing the *Just* requirements as well as the prejudice versus the probative value of the evidence and found that the "allegedly unlawful use of a firearm three years prior to this is relevant; the jury should hear about it to determine the manner in which the defendant acted in the present condition."

Our analysis of the admissibility of other crimes evidence does not end with the fulfillment of the requirements of *Just*. The State must also demonstrate that the evidence is logically relevant towards one of the Rule 404(b) examples or some other fact in issue

11

and not merely introduced as proof of a character defect or propensity of the defendant in order to show that he acted in conformity therewith. Rule 404(b), M.R.Evid. The trial judge ruled that the evidence was admissible to show intent or motive and to explain away accident or mistake. To be admissible as relevant towards motive, the commission of the first crime or act should give rise to a motive or reason for the defendant to commit the second crime. See e.g. State v. Simpson (1939), 109 Mont. 198, 95 P.2d 761. Thus, while the District Court mentioned the motive exception in its ruling, the applicable Rule 404(b) example here is intent. In this regard, both the State and the defendant urge us to examine the facts of this case in light of the Oregon Supreme Court's analysis in State v. Johns, supra, 725 P.2d 312.

In Johns the Court noted that intent or state of mind is often the most difficult element of a crime to prove. Johns, 725 P.2d at 321. The Johns court also noted that intent and absence of mistake or accident were really the same issue under the facts of that case. Under the facts of this case, we note that the issue of intent is really synonymous with absence of a justification for the use of force by the defendant, i.e., whether the defendant was actually the aggressor in this case.

The Johns court analyzed that case according to Wigmore's logical relevance theory of admissibility for prior crime evidence involving the issue of mens rea. See 2 Wigmore, Evidence in Trials at Common Law, § 302 (rev.ed. 1979). Wigmore's theory is based on

12

the doctrine of chances; it does not ask the trier of fact to infer the defendant's state of mind from the defendant's subjective character; rather, it asks the trier to make an intermediate inference of objective improbability under the doctrine of chances and then an ultimate inference of intent based on the improbability of the conduct. Johns, 725 P.2d at 323, citing Imwinklereid, Uncharged Misconduct Evidence 8, § 5.05; see also Roth, Understanding Admissibility of Prior Bad Acts: a Diagrammatic Approach, 9 Pepperdine L.Rev. 297 (1982). Imwinklereid explains Wigmore's theory:

> ". . . The doctrine teaches us that the more often the defendant performs the actus reus, the smaller is the likelihood that the defendant acted with an innocent state of mind. The recurrence or repetition of the act increases the likelihood of a mens rea or mind at fault. In isolation, it might be plausible that the defendant acted accidentally or innocently; a single act could easily be explained on that basis. However, in the context of other misdeeds, the defendant's act takes on an entirely different light. The fortuitous coincidence becomes too abnormal, bizarre, implausible, unusual, or objectively improbable to be believed. The coincidence becomes telling evidence of mens rea.

Imwinklereid, supra, at 8, § 5.05.

Some commentators have concluded that under such a theory the proponent must have evidence of more than one prior similar instance of conduct. Johns, 725 P.2d at 324; see e.g. Note, Admissibility of Evidence of Prior Crimes in Murder Trials, 25 Ind.L.J. 64, 68 n 23 (1949-50); Comment, The Admissibility of Evidence of Extraneous Offenses in Texas Criminal Cases, 14 S.Tex. L.J. 69, 96 (1973). Others, including Imwinkleried, assert that

in terms of logical relevance even a single similar act would increase the likelihood that a defendant acted intentionally. "So long as the defendant has performed the act 'oftener than once,' the act has some logical relevance on the issue of intent." Imwinklereid, supra, at 12, § 5.06. "[T]he mere prior occurrence of an act similar in its gross features--i.e., the same doer, and the same sort of act, but not necessarily the same mode of acting nor the same sufferer--may suffice for that purpose." Roth, supra, at note 43, quoting 2J Wigmore, supra, at 251, § 304.

We agree with the Johns court that no categorical statement can be made one way or the other, rather such decisions must be made on a case by case basis. Johns, 725 P.2d at 324. "A simple unremarkable single instance of prior conduct probably will not qualify, but a complex act requiring several steps, particularly premeditated, may well qualify." Johns, 725 P.2d at 324.

Thus, the linchpin for determining whether a single instance of prior conduct is sufficient to prove intent is relevancy based on similarity. Here, because the defendant admits that he purposely and knowingly killed Rob Hare, the prior uncharged misconduct actually is relevant towards the reasonableness of Sadowski's claim of self defense, i.e., whether he acted with criminal intent or in self defense. We conclude that the prior act is sufficiently similar to be admissible on this issue. Both instances involved the use of alcohol and firearms. Both instances can be characterized as stressful; one involved marital discord and

14

attempted suicide, the other involved the defendant's subjective belief of a possible robbery. Deputy Campbell testified that when Sadowski pointed the gun at him in the prior incident, he said something to the effect that "I no longer had control . . . [h]e meant that he had control now, not me." Phil Sadowski's own testimony indicates that upon becoming concerned about Rob Hare's alleged bizarre comments, he pulled the gun out before he asked everyone to leave. In both instances, the defendant while intoxicated pointed a firearm at an invitee in his home allegedly to gain control of what he believed to be an out-of-control situation in his own home. The prior act is admissible as relevant towards Sadowski's intent and the justification for using force to defend himself.

The District Court did not abuse its discretion.

## II.

As his second issue, Sadowski argues that the prosecutor improperly commented upon and emphasized, as well as cross-examined the defendant concerning, the defendant's post-arrest, post-Miranda-warning silence in violation of Doyle v. Ohio (1976), 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91. In Doyle, the United States Supreme Court held that use of a defendant's silence maintained after Miranda warnings was fundamentally unfair because Miranda warnings inform a person of his right to remain silent and assure him, at least implicitly, that his silence will not be used against him. Anderson v. Charles (1980), 447 U.S. 404, 407-408,

100 S.Ct. 2180, 2182, 65 L.Ed.2d 222, 226; <u>Doyle</u>, 426 U.S. at 618-619, 96 S.Ct. at 2245, 49 L.Ed.2d at 97-98.  For purposes of identification each violation alleged in this case will be numbered.

1.  The State on redirect questioned the arresting officer Rash as follows:

Q.  Deputy Rash, from the time that you arrived  at the building until  the Defendant was  taken  away  from  the building, how much time elapsed?  Can you tell me?

A.   I would  say  I arrived  4:07  a.m.  and Lieutenant Pronovost arrived  at 4:29  a.m., possibly 20 minutes.

Q.  Now during that time, other than saying "I shot him," did the defendant say anything else?

A.  Not that I heard.

(Transcript at 179.)

2.  The State later questioned Officer Adams who transported defendant from the Furniture Doctor to the Law and Justice Center:

Q.  Did anything occur from the Furniture Doctor building when you transported him to the Law and Justice  Center here?  Did anything occur in your car?

A.  No.

Q.  Did the Defendant say anything to you?

A.  While in the vehicle?

Q.  Yes.

A.  Not that I recall, no, he did not.

(Transcript at 478.)

3.  During cross-examination of Sadowski by the State the following colloquy took place:

16

Q.   Now, there at the building, at the shop when they were there, you made the statement that, "I shot him," right?

A.   Yes.

Q.   What were the other officers doing while you were there?  Did you see them?

A.   There were a bunch of people.  There were a bunch of people doing all kinds of things.

Q.   Did you ever say to anybody, "That man had a knife in his hand and its over there, look for it"?

A.   No, I didn't.

Q.   Why not?

A.   It didn't occur to me.

(Transcript at 673.)

4.   Later in cross-examination, the State asked Sadowski the following questions:

Q.   Now, you rode from your shop in to the Law and Justice Center, right?

A.   Yes.

.  .  .  .

Q. So you rode with him from there to here, what did you tell him?

A.   We were just having some conversation.

Q.   In fact the first time you mentioned anything about a knife, or something was some silver thing, was in this building when you were talking to Bryan Adams downstairs, right?

A.   I'm not sure of that.

Q.   Well, did you ever tell anybody before that?

A.   I don't think so.

17

Q. Why did it occur to you that you should tell him when you were on the second floor down here?

A. I'm not sure. I don't remember the circumstances.

. . . .

Q. The truth is that you told Bryan Adams that because you knew that you were in a whole lot of trouble and you had better put a weapon in Rob Hare's hands; is that right?

A. No, that's not right.

Q. Because you had training in self-defense and you knew when deadly force could be used; isn't that right.

A. I didn't know from a legal standpoint when it could be used. I know what common sense told me. . . .

(Transcript 675-6.)

5. Sadowski argues that the State also commented on Defendant's post-Miranda silence during the opening portion of the State's final argument:

> . . . You'll remember how officer Adams characterized the defendant when he said he was looking down the hall, and then he turned and looked at Officer Adams and said, "shoot to kill." That's the first time that anybody heard about Rob Hare having any kind of a deadly weapon . . .

(Transcript at 864.)

6. Sadowski claims that this prejudice was compounded later when the State argued in rebuttal:

> The knife was fabricated. The shiny object was fabricated in this building on the second floor down here. . . .
>     . . .
> He had every opportunity out there when the sheriff's deputies arrived to talk about the weapon. What happened here? "I shot him". What would a reasonable person do? "I shot him because I had to because he had a shiny object; he had a knife. He was attacking me. I shot

18

him." . . .

(Transcript at 915-916.)

Because Doyle is based on principles of fundamental fairness that a defendant's silence after receipt of governmental assurances will not be used against him, the prohibition of Doyle does not apply to pre-arrest silence before the Miranda warning is issued. State v. Furlong (1984), 213 Mont. 251, 258, 690 P.2d 986, 989; State v. Wilson (Mont.1981), 631 P.2d 1273, 1277; Jenkins v. Anderson (1980), 447 U.S. 231, 238-240, 100 S.Ct. 2124, 2129-2130, 65 L.Ed.2d 86, 94-96. And although use against a criminal defendant of silence maintained after receipt of governmental assurances of one's right to silence is barred by Doyle, this directive does not apply to language that inquires into prior inconsistent statements. Such comment makes no unfair use of silence, because a defendant who voluntarily speaks after receiving Miranda warnings has not been induced to remain silent. State v. Wiman (1989), 236 Mont. 180, 187, 769 P.2d 1200, 1204, citing Anderson v. Charles, supra, 447 U.S. at 408, 100 S.Ct. at 2182, 65 L.Ed.2d at 226. Here then the issue of improper comment on silence can be divided into two parts. Silence before the arrest and Miranda warning and silence after arrest and Miranda warning. Alleged violations No. 3, the first quotation of Sadowski's cross-examination, and 6, rebuttal to final argument, refer to pre-arrest silence.

The State argues that the Defendant made four inconsistent

19

statements regarding the shooting: one to the dispatcher on the telephone, one to the police when they arrived on the scene, and the two to the police at the law and justice center, indicating that the victim had a weapon. However, in this case we need not determine whether these statements were inconsistent. These questions and comments that Sadowski alleges constitute fatal error are thinly spread throughout some 900 pages of transcript. Furthermore, we note that the defendant never posed an objection to any of the prosecutor's questions or comments.

Generally, the failure to object in a timely manner constitutes a waiver of alleged error. Section 46-20-104, MCA; State v. Wilkins (1987), 229 Mont. 78, 80, 746 P.2d 588, 589. However, when substantial rights of a defendant as here are involved, the lack of timely objection does not preclude us from exercising our power of review to examine any error at the trial court level. Section 46-20-701(2), MCA; State v. Harris (1984), 209 Mont. 511, 517, 682 P.2d 159, 162; Rule 103(d), M.R.Evid. Our review of the record in this case indicates that defense counsel actually asked the first question alluding to Sadowski's silence on cross-examination of Officer Rash, in a manner implying innocence:

Q. Phil Sadowski, the entire time you were there, never denied he did the shooting, did he?

A. No, sir, not that I can recall.

(Transcript p. 172) This opened the door for the prosecutor's questioning of Officer Rash on redirect, quoted earlier and

numbered as excerpt 1, that Sadowski alleges was the beginning of the State's allegedly repeated Doyle violations.

In State v. White (1982), 200 Mont. 123, 127-128, 650 P.2d 765, 767-768, we held that the defendant's post-Miranda, pretrial silence is a proper subject of cross-examination where defendant raises the issue of his earlier silence and proceeds to characterize that silence as proof of innocence rather than as an exercise of his Miranda rights. In White the defendant raised the issue in his direct testimony, here it was first raised on cross-examination of a State's witness, and then rebutted by the State on redirect. Then later, the defense first focused on Sadowski's post-Miranda silence on cross-examination of Sheriff Cutting:

> Q. So Phil Sadowski never, at any spot from the time you took him from the scene until the time you took him down here to the station, all during the time of the statement, never told you that he saw a knife in Rob Hare's hand, did he?
>
> A. No. That was asked, the question was asked by Lieutenant Christie.

(Transcript p. 513.) In White we held that there was no violation of Doyle where this issue was first raised by defendant as evidence of guilt on direct examination. The same would apply to cross-examination and later argument. These alleged violations No. 3, 4, 5 and 6, are subsequent in time to the above cross-examination of Sheriff Cutting. Alleged violation No. 2 is not clear as to purpose and appears to be an inquiry as to what happened and not argumentative for the purpose of showing inconsistencies. To arrive at a conclusion that Rash's redirect (1) and Adam's direct

(2) are violations of <u>Doyle</u>, is accomplished by conjecture when viewed in context. We find there is no plain error or <u>Doyle</u> violation when viewed in context, where the defendant first focuses on the issue of his earlier silence in cross-examination of the State's witnesses, fails to object to the State's reference to the same silence for alleged improper purposes, and then for the first time on appeal alleges that admission of such evidence constitutes plain reversible error.

## III.

Finally, Sadowski contends that it was reversible error for the investigating police officers not to take into evidence items from the crime scene that may have been weapons used by the victim that would support the defendant's affirmative defense of justifiable use of force. The officers at the scene were not immediately informed of the use of any type of weapon by the deceased. Testimony of officers at the scene indicates that the police did look for a possible weapon, but could find nothing in close proximity to the body of the victim except a set of keys on a table two or three feet away from and above the body, and an apparently undisturbed chisel covered with dust approximately fifteen feet from the body. Sadowski argues that the prejudice he suffered due to the officers' failure to obtain fingerprint evidence of these and other potential weapons was compounded by the prosecutor's comments on final argument of "where is the weapon?"

First, we note that the defense had a full opportunity to

cross-examine the officers concerning the reasons why they chose not to fingerprint such items, as well as introduce objects that it contended should have been fingerprinted. Moreover, it is well settled that while a criminal defendant has a constitutional right to obtain exculpatory evidence and that the denial of such right is a violation of due process, this right is only a personal right to obtain exculpatory evidence. It does not require that police officers take initiative or even assist in procuring evidence on behalf of a defendant. State v. Swanson (1986), 222 Mont. 357, 360-362, 722 P.2d 1155, 1157-1158; In re Martin (Cal.1962), 374 P.2d 801, 803.

Sadowski characterizes the failure of the police to gather evidence of a weapon on his behalf as a suppression of evidence. See Brady v. Maryland (1963), 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215. However, only a deliberate or intentional suppression of exculpatory evidence is a per se violation of due process. To amount to a violation of due process, negligently suppressed evidence must be material and of substantial use, vital to the defense, and exculpatory. State, City of Bozeman v. Heth (1988), 230 Mont. 268, 272, 750 P.2d 103, 105. Furthermore, in Heth, this Court drew a distinction between "gathering" and "preserving" evidence:

> Swanson . . . does not stand for the proposition that police officers have to assist in the gathering of such [exculpatory] evidence.
> . . .
> . . . Police officers do not have an affirmative duty to search out favorable evidence for the defendant. . .

23

Heth, 750 P.2d at 105. We reaffirmed this rule in State v. Clark (1988), 234 Mont. 222, 225, 762 P.2d 853, 855-856, holding that there is no affirmative duty on police officers to obtain exculpatory evidence, but they must avoid interference with the efforts on the part of the accused to obtain such evidence. Accordingly, we find no error on this issue, as well as the other issues presented in Sadowski's appeal. The judgment is

**AFFIRMED.**

_____
Justice

We Concur:

_____
Chief Justice

_____

_____

_____

_____
Justices

Justice William E. Hunt, Sr., dissenting:

I dissent. This Court persists in playing fast and loose with the rules of evidence, and in so doing, strips the criminally accused of the few but essential protections afforded them by the law and by the rules. The American criminal justice system is premised on the notion that all defendants are innocent until proven guilty of the crime charged. To that end, the federal and state rules of evidence disallow testimony about the defendant's character or about other behavior unrelated to the crime. Recent decisions by this Court, allowing the state to use evidence of prior "bad" acts, have systematically dismantled this bulwark of justice, which has been erected to prevent government abuse and selective punishment of the unpopular. The decision today that Sadowski's prior act is admissible under Rule 404(b) moves the Court finally to the absurd result it has been gravitating toward since its decision in State v. Just, 184 Mont. 262, 602 P.2d 957 (1979). Further, this decision not only tampers with the accused's rights through the rules of evidence--it also weakens protections against self-incrimination by permitting the state to highlight the defendant's post-<u>Miranda</u> silence. All in all, the decision is a disaster for the people of the state of Montana.

Our criminal justice system is carefully designed to try the accused for the crime for which he or she has been charged, and no other. The rules of evidence reflect this policy by prohibiting evidence of other acts or crimes by the defendant unless those acts are clearly relevant to the crime charged, and are more essential

25

to the prosecution's case than they are prejudicial to the defendant. We go further and say that if prior conduct is indeed relevant, it must then meet the procedural requirements set out in Just. The Court today has blurred the distinction between the specific relevancy requirement of 404(b) and the more mechanical admissibility test set out in Just. By blurring the technical lines, we impair our ability to see the "big picture" of which Rule 404(b) is a crucial part.

Almost three years before Philip Sadowski claimed he took another man's life in self-defense, he was distraught over a pending marital separation. In his distress, he contemplated suicide. Perhaps because he did not have other means at his disposal, Sadowski chose a gun with which to threaten the suicide. He phoned the local authorities to tell them about his trauma. The police arrived, and Sadowski talked to one officer for almost three hours. According to the officer's testimony, when Sadowski's wife came home, he pointed the gun at the sheriff for about one second. One thousand one. That's all. Then, out of earshot of the sheriff, he pointed it at his own head once, then gave it to his wife, who gave it to the sheriff. Sadowski was taken into custody for his own protection and was never charged with a crime. Now this Court would have us believe that Sadowski's traumatic evening in 1986 is relevant to whether or not he used his weapon in self-defense in an after hours party with strangers in 1989. Incredible.

Rule 404(b) permits only evidence of acts probative of the

fact in issue, not evidence that displays a person's propensity to act in a certain way. Character evidence is specifically excluded because of the strong likelihood that the jury will convict on the overall tendencies of the person rather than on evidence of the crime charged. What does Sadowski's behavior when faced with a divorce tell us about his behavior when faced with an attack? Nothing. Nothing but that in both instances he is capable of picking up a gun. It tells us nothing about whether when Phil Sadowski shot Rob Hare the use of force was justifiable.

The majority cites State v. Johns (Or. 1986), 725 P.2d 312, 324, regarding relevancy: "A simple, unremarkable single instance of prior conduct probably will not qualify, but a complex act requiring several steps, particularly premeditated, may well qualify." Where in this case is the similarity of complex acts requiring several premeditated steps? The majority states that relevancy based on similarity determines whether an act is sufficient to prove criminal intent as opposed to self defense. But the two incidents in question are so completely different in mental condition of the defendant, surrounding circumstances, act committed, victims, etc., that no reasonable person could say one is instructive of the other.

Next, even if we were to somehow conclude that the August 4, 1986, incident was relevant to a self-defense claim, the act would have to meet the _Just_ requirements for admissibility. Briefly, _Just_ states that the prior act must be similar, near in time, tend to establish a common scheme or plan, and be more probative than

27

prejudicial. An act need not satisfy all four elements, but must substantially fulfill the requirements. And _Just_ carries the caveat:

> We are concerned, nevertheless, with the possibility that the exceptions we have discussed thus far may "swallow up" the general rule . . . As we have stated: 'The general rule should be strictly enforced in all cases where applicable, because of the prejudicial effect and injustice of such evidence, and should not be departed from except under conditions which clearly justify such a departure. The exceptions should be carefully limited, and their number and scope not increased.' " _Just_, 184 Mont. at 271, 602 P.2d at 962. (Citations omitted.)

The Court today has not only swallowed up the general rule, it has made a feast of that most fundamental principle of our justice system--the presumption of innocence.

The first _Just_ element is similarity of acts. This dissent has discussed the glaring dissimilarities of the two acts in question here. _Just_, a sexual intercourse without consent case, permitted evidence of other sexual acts of the same kind with the same victim, several times within a three year span. _Johns_, on which the majority relies, involved two assaults--both during periods of marital discord when the defendant had failed to become a police officer and was financially dependent on his spouse, and both after the defendant had threatened to kill the spouse. It is this consistency of detail that the first _Just_ element contemplates, and that the facts before us sorely lack. Most of the other _Just_ factors are also missing. The 1986 suicide attempt obviously does not establish a common scheme, plan, or motive. And, as explained above, the act is not probative of any fact in issue at all--let alone more probative than prejudicial.

Nearness in time is the only _Just_ factor in evidence. Without any other support, the act absolutely should not have been admitted. The general rule has been swallowed whole.

The majority's reliance on _Johns_ is particularly interesting in light of the fact that _Johns_ sets out six criteria with which to evaluate prior crimes on the issue of intent, and only one of those criteria is satisfied here: the present crime charged requires proof of intent. The other factors, including intent of prior act, similarity of victims, similarity of acts and of physical elements, simply are not in evidence. The majority uses the evidentiary discussion from _Johns_ but does not arrive at the Oregon Court's inevitable conclusion: that if the acts are sufficiently dissimilar, the earlier one is not probative of the later one.

This result is not surprising when one considers the erosion of the rule as evidenced by this Court's decisions. We have slowly gotten to the point where today we can say that pointing a gun briefly at an officer during a suicidal episode almost three years ago is probative of whether the defendant shot a potential assailant in self-defense. Why don't we just come out and say that anything that anybody has ever done wrong is admissible in criminal prosecutions? The decision today nets the same result.

Further, the decision to permit evidence of the defendant's post-_Miranda_ silence is questionable at best. Implying that post-_Miranda_ silence is evidence of fabrication, regardless of when it was raised or whether or not an objection was made, is tantamount

to negating the whole purpose of the <u>Miranda</u> warning and the Sixth Amendment protections of the United States Constitution. The arrestee is supposed to be perfectly free to remain silent after arrest without fear of implication. That is what the law intends and should be what this Court upholds. I would reverse the District Court.

_____
Justice

I concur in the foregoing dissent.

_____
Justice