STATE OF NEBRASKA, APPELLEE, V.
LEO H. MCMANUS, APPELLANT.
594 N.W. 2d 623

Filed May 28, 1999.    No. S-97-1347.

James R. Mowbray and, on brief, Robin W. Hadfield, of the Nebraska Commission on Public Advocacy, for appellant.

Don Stenberg, Attorney General, and, on brief, Jennifer S. Liliedahl for appellee.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

CONNOLLY, J.

Leo H. McManus (McManus) appeals from his convictions following a jury trial for second degree murder and the use of a weapon to commit a felony. We reverse, and remand for a new trial because the trial court erred in admitting, for an improper purpose, testimony regarding a prior uncharged "bad act."

## I. BACKGROUND

McManus and Roy T. Jones were employed by C. Dennis Geiser as bricktenders. On the morning of January 2, 1997, McManus met Jones and Geiser at Geiser's house. The three men rode together in Geiser's truck to a jobsite in Stapleton, Nebraska. At about noon, they ran out of sand at the jobsite, so they went to the Wagon Wheel Bar in Stapleton for lunch. The three men spent the afternoon drinking at the bar.

Later in the evening, Geiser, the victim, accused McManus of stealing Jones' wallet. Jones' wallet had been stolen before, and Jones had suspected McManus. The police were called, and McManus was searched. It turned out that McManus had not stolen the wallet. Jones had simply left the wallet in his shirt,

which was sitting on a chair near the pool table. That night, McManus told Geiser he was going to quit working for him because of the false accusation regarding the wallet.

McManus rode home with a friend, where he picked up his .44 Magnum pistol and asked his wife to drive him to Geiser's house to get his truck and some personal property. McManus' wife drove him to Geiser's house, and she then went home, leaving McManus at Geiser's house. Geiser was not at home, so McManus spoke with Geiser's wife, who told McManus to return in the morning to pick up McManus' personal property.

McManus went to a friend's home to pick up some equipment stored there. On his way back to town from his friend's house, McManus saw Geiser's pickup. He followed Geiser home and attempted to speak with him. The two men scuffled, and Geiser was fatally shot with McManus' .44 Magnum pistol.

At trial, McManus stated that the shooting was an accident. McManus testified that when he got out of his pickup, Geiser threatened to shoot him. McManus approached Geiser, who then threw a punch at McManus and attempted to grab McManus' pistol. A struggle for the pistol ensued, and the weapon accidentally discharged, killing Geiser.

The State intended to offer evidence of two other bad acts committed by McManus using his .44 Magnum pistol. A hearing was held pursuant to Neb. Evid. R. 404, Neb. Rev. Stat. § 27-404 (Reissue 1995), to determine whether the alleged acts had occurred. The trial court determined by clear and convincing evidence that one of the alleged acts, involving Sherri McManus, who at the time was McManus' future sister-in-law, had occurred and was admissible at trial to show intent, the absence of mistake or accident, and to rebut whether McManus acted in self-defense.

Sherri testified that she and McManus, along with McManus' brother Thomas McManus, had been drinking at a local bar and were accompanied by McManus' son Ryan McManus. The parties left the bar and drove to Sherri and Thomas' home, where they continued to drink. They were sitting at the dining room table when McManus suddenly pulled out his .44 Magnum pistol and pointed it between Sherri's eyes. McManus stated that Sherri would not live to be a McManus.

Sherri then took the pistol away from McManus, unloaded it, and threw the shells outside. Ryan took the pistol and put it in the trunk of McManus' car. Ryan and McManus then left Sherri's residence.

## II. ASSIGNMENT OF ERROR

McManus asserts, inter alia, that the trial court erred in finding by clear and convincing evidence that the bad act occurred and in admitting the bad act into evidence.

## III. SCOPE OF REVIEW

In all proceedings where the Nebraska Evidence Rules apply, admissibility of evidence is controlled by the rules, not judicial discretion, except in those instances when judicial discretion is a factor involved in the admissibility of evidence. *State v. Carter*, 255 Neb. 591, 586 N.W.2d 818 (1998). Because the exercise of judicial discretion is implicit in Neb. Evid. R. 401, Neb. Rev. Stat. § 27-401 (Reissue 1995), it is within the discretion of the trial court to determine relevancy and admissibility of evidence of other wrongs or acts under Neb. Evid. R. 403, Neb. Rev. Stat. § 27-403 (Reissue 1995), and rule 404(2), and the trial court's decision will not be reversed absent an abuse of that discretion. *State v. Carter, supra.*

## IV. ANALYSIS

Although McManus argues that the evidence was insufficient to support a finding by clear and convincing evidence that the bad act in the instant case actually occurred, we do not address this issue, since, assuming that the act occurred, it was nonetheless inadmissible.

Rule 404(2) states:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he or she acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

By its plain language, rule 404(2) prohibits the admission of evidence of other bad acts for the purpose of demonstrating a person's propensity to act in a certain manner. However, as the

second sentence of the above-quoted language indicates, the admission of other bad acts evidence is prohibited only if the relevance of such evidence is dependent upon the actor's propensity to commit the act. Stated another way, evidence of other bad acts which is relevant for any purpose other than to show the actor's propensity to commit the act is admissible under rule 404(2). Thus, rule 404(2) divides evidence of other bad acts into two categories according to the *basis of the relevance* of the acts: (1) relevant only to show propensity, which is not admissible, and (2) otherwise relevant (nonpropensity), which is admissible. Andrew J. Morris, *Federal Rule of Evidence 404(B): The Fictitious Ban on Character Reasoning From Other Crime Evidence*, 17 Rev. Litig. 181 (1998).

Despite its seeming simplicity, this court and other courts have grappled with its application. Rule 404(2) is one of the most frequently litigated issues on appeal, "and the erroneous admission of such evidence is the largest cause of reversal." 1 Edward J. Imwinkelried, Uncharged Misconduct Evidence § 1:04 at 20 (rev. ed. 1999). The confusion surrounding rule 404(2) stems, in large part, from its close relationship with rules 401 and 403, both of which are necessary components of a complete analysis of other bad acts evidence.

This court has long stated that an appellate court reviews the admission of other bad acts evidence under rule 404(2) by considering (1) whether the evidence was relevant, (2) whether the evidence had a proper purpose, (3) whether the probative value of the evidence is substantially outweighed by its potential for unfair prejudice, and (4) whether the trial court, if requested, instructed the jury to consider the evidence only for the limited purpose for which it was admitted. See *State v. Carter*, 255 Neb. 591, 586 N.W.2d 818 (1998). However, only one of the four prongs of this analysis, the second prong regarding proper purpose, embodies the language in rule 404(2). The first prong, relevance, is designed to satisfy the demands of rule 401, and the third prong, concerning the balance between probative value and unfair prejudice, is designed to satisfy rule 403. As for the fourth prong, it is intended to prevent the unfair prejudice that may result from the admission of such evidence if the jury considers it for an improper purpose.

### 1. RULE 401 (RELEVANCE) AND
### RULE 404(2) (PROPER PURPOSE)

Although the above analysis seems straightforward, it has proved to be difficult to apply in practice. This court has often in its analysis confused logical relevance under rule 401 and relevance for a proper purpose under rule 404(2). See, e.g., *State v. Ellis*, 208 Neb. 379, 303 N.W.2d 741 (1981). An example of this confusion may be found in *State v. Ellis*, 208 Neb. at 390, 303 N.W.2d at 749, wherein we incorrectly stated that other bad acts "evidence is ordinarily prejudicial because prior criminal activity is irrelevant to the proof of the commission of a specific crime." A review of logical relevancy under rule 401 demonstrates why this statement is false.

### (a) Relevance

It is axiomatic that only relevant evidence is admissible, *State v. Merrill*, 252 Neb. 736, 566 N.W.2d 742 (1997); if evidence is not relevant under rule 401, it is inadmissible, *State v. Fahlk*, 246 Neb. 834, 524 N.W.2d 39 (1994). Evidence is relevant when it has *any* tendency to make the existence of any fact that is of consequence to the determination of the action *more probable or less probable* than it would be without the evidence. *State v. Carter, supra*, citing rule 401. Thus, to be relevant under rule 401, all that must be established is a rational, probative connection, however slight, between the offered evidence and a fact of consequence. See, R. Collin Mangrum, *Nebraska's Evidentiary Rules of Relevancy*, 29 Creighton L. Rev. 119 (1995); *People v Crawford*, 458 Mich. 376, 582 N.W.2d 785 (1998).

As has already been stated, rule 404(2) prohibits the admission of other bad acts evidence for the purpose of demonstrating a person's propensity to act in a certain manner. However, this does not mean that such evidence is not relevant; on the contrary, it is typically relevant for that very purpose under rule 401. See *Wynn v. State*, 351 Md. 307, 718 A.2d 588 (1998). The fact that a defendant has committed a crime on another occasion tends to show that the defendant has a propensity to commit crimes, and thus, it is (perhaps only slightly) more probable that the defendant has committed the crime at issue than a defend-

ant without such a propensity. Huey L. Golden, *Knowledge, Intent, System, and Motive: A Much Needed Return to the Requirement of Independent Relevance*, 55 La. L. Rev. 179 (1994).

■ If evidence of other bad acts is relevant to show a person's propensity, why is it excluded? The short answer: Not all logically relevant evidence is admissible. See Neb. Evid. R. 402, Neb. Rev. Stat. § 27-402 (Reissue 1995). In response to the demands of particular policies, the exclusion of evidence may be required, despite its relevancy. Proposed Nebraska Rules of Evidence, rule 402, comment (1973). Rule 404 requires such a result. See *id.*

The reason evidence of other bad acts to show propensity is excluded, despite its relevancy, is that it creates the risk of a decision by the trier of fact on an improper basis. 1 Edward J. Imwinkelried, Uncharged Misconduct Evidence § 1:03 (rev. ed. 1999). See, also, *State v. Ellis, supra* (Brodkey, J., dissenting). First, the admission of bad acts evidence tempts the trier of fact to condemn the defendant for his or her other (and often unpunished) bad acts, rather than the defendant's guilt of the present charge. Imwinkelried, *supra*. See, also, *State v. Ellis, supra* (Brodkey, J., dissenting). Second, there is a danger that the trier of fact will overestimate the probative value of the other bad act evidence. *Id.* Thus, the exclusion of other bad acts evidence offered to show the defendant's propensity protects the presumption of innocence, and is "deeply rooted in our jurisprudence." *People v Crawford*, 458 Mich. at 383, 582 N.W.2d at 790. However, when such evidence is offered for a purpose other than to demonstrate propensity and is more probative than prejudicial and when a proper limiting instruction is given, the evidence is nonetheless admissible under rule 404(2).

### (b) Proper Purpose

■ As the foregoing discussion demonstrates, the relevance of other bad acts to the charged crime, in and of itself, satisfies only the demands of rule 401. The key inquiry under rule 404(2) is the basis of the relevance of the acts. Rule 401 asks whether the evidence is relevant, whereas rule 404(2) asks *why* the evidence is relevant. If the evidence is relevant because it tends to

show the defendant's criminal disposition or propensity to commit a certain type of crime, it is relevant for an improper purpose and is inadmissible under rule 404(2). However, if it is relevant to show something other than the defendant's character, then it is relevant for a proper purpose and is admissible under rule 404(2). Thus, the question is whether the evidence of other bad acts is relevant for a proper purpose, not merely whether the evidence is relevant.

### (i) Independent Relevance

■ Evidence that is offered for a proper purpose is often referred to as having "special relevance" or "independent relevance," which means its relevance does not depend on its tendency to show propensity. See Imwinkelried, *supra*, § 2:19. Thus, the term "independent relevance" is synonymous with the term "proper purpose."

Nonetheless, in the past, this court has on occasion erroneously equated the term "independent relevance" with logical relevance under rule 401. See, e.g., *State v. Carter*, 246 Neb. 953, 524 N.W.2d 763 (1994), *overruled on other grounds, State v. Freeman*, 253 Neb. 385, 571 N.W.2d 276 (1997). For example, in *Carter*, this court addressed whether evidence of the defendant's prior sexual assaults was admissible under rule 404(2). In addressing the first prong of this court's rule 404(2) analysis, relevance under rule 401, we stated that "evidence of other similar sexual conduct has independent relevance, and such evidence may be admissible whether that conduct involved the complaining witness or third parties." *State v. Carter*, 246 Neb. at 963-64, 524 N.W.2d at 772. Having determined that the evidence was independently relevant, we stated: "Next, we must determine whether the evidence had a proper purpose." *Id.* at 964, 524 N.W.2d at 772. Because "independent relevance" is synonymous with "proper purpose," any additional analysis on the latter point is superfluous.

### 2. RULE 403 (BALANCING)

■ Even if evidence of other bad acts is relevant for a nonpropensity purpose, and thus, admissible under rule 404(2), exclusion may nonetheless be required under rule 403 if the probative value of the evidence is substantially outweighed by

the danger of unfair prejudice. See, e.g., *State v. Newman*, 250 Neb. 226, 548 N.W.2d 739 (1996). Because we conclude that the evidence in the instant case was not offered for a proper purpose, we do not reach this prong of the analysis.

### 3. LIMITING INSTRUCTION

Finally, if evidence of other bad acts is admitted into evidence, the trial court, if requested, must give a limiting instruction. *State v. Carter*, 255 Neb. 591, 586 N.W.2d 818 (1998). The limiting instruction is required because even though another proper purpose may exist for the admission of evidence under rule 404(2), there is always the danger that the jury will draw the forbidden inference of propensity.

> When a juror learns that a defendant has previously committed the same crime as that for which he is on trial, the risk is severe that the juror will use the evidence precisely for the purpose that it may not be considered, that is, as suggesting that the defendant is a bad person, a convicted criminal, and that if he "did it before he probably did it again."

*People v Crawford*, 458 Mich. 376, 398, 582 N.W.2d 785, 796 (1998), quoting *U.S. v. Johnson*, 27 F.3d 1186 (6th Cir. 1994).

### 4. SUMMARY OF RULE 404(2) ANALYSIS

Based on the principles discussed in the instant case, this court's rule 404(2) analysis considers whether the (1) evidence was relevant for some purpose other than to prove the character of a person to show that he or she acted in conformity therewith, (2) probative value of the evidence is substantially outweighed by its potential for unfair prejudice, and (3) trial court, if requested, instructed the jury to consider the evidence only for the limited purpose for which it was admitted.

Thus, to determine whether the other bad act evidence was admissible in the instant case, we first determine whether McManus' other bad act was relevant for some purpose other than to show McManus' propensity to engage in such activity.

### 5. APPLICATION OF LAW TO FACTS

At the outset, we note that the trial court properly stated the purposes for which it considered the other bad act evidence rel-

evant and instructed the jury to consider the evidence only for those purposes. However, the State's argument does not distinguish between any of the bases of admissibility relied on by the trial court. Because all of the purposes cited by the State and the trial court for admissibility of the evidence go to McManus' mens rea and because the State has not articulated a different line of reasoning for any particular purpose, we will consider the evidence generally as it relates to intent.

The State asserts that the evidence is relevant for the purpose of demonstrating McManus' intent because the other bad act is similar to the events in the instant case. The State notes that in both instances, McManus had been drinking at a bar, became intoxicated and angry, and used a gun to intimidate. However, the State does not articulate any reason as to *why* the similarity between the act involving Sherri and the act in the instant case in any way demonstrates McManus' intent concerning Geiser.

The most obvious reason why the similarity between the two acts may show the intent of McManus in the instant case is the inference that McManus is the type of person who acts with violent intent when he is angry. However, this is classic propensity reasoning, and thus, although the evidence may be relevant for that purpose, it must be excluded under rule 404(2). See *State v. Buechler*, 253 Neb. 727, 572 N.W.2d 65 (1998).

Is there another intermediate inference which may be drawn from the act involving Sherri that would tend to establish McManus' intent in the instant case? The State's argument that the other bad act was similar to the charged events and that this similarity gave rise to a permissible inference of intent is properly analyzed under the "doctrine of chances." "The only theory of logic under which evidence of other misconduct is directly relevant to prove intent . . . without relying on character inferences, is the doctrine of chances," Eric D. Lansverk, *Admission of Evidence of Other Misconduct in Washington to Prove Intent or Absence of Mistake or Accident: The Logical Inconsistencies of Evidence Rule 404(b)*, 61 Wash. L. Rev. 1213, 1225 (1986), also known as the "doctrine of objective improbability," *People v Crawford*, 458 Mich. 376, 582 N.W.2d 785 (1998).

### (a) Doctrine of Chances

As already indicated, rule 404(2) prohibits the admission of bad act evidence that is relevant only to show that the defendant has a propensity to act in a certain manner. The rule is designed to prevent the trier of fact from inferring the defendant's state of mind on the charged occasion from the defendant's subjective, personal character, disposition, or propensity. *State v. Sullivan*, 216 Wis. 2d 768, 576 N.W.2d 30 (1998). The doctrine of chances purports to avoid asking the trier of fact to infer the defendant's state of mind from the defendant's subjective, personal character by asking the trier of fact to make an "intermediate inference of *objective improbability* under the doctrine of chances and then an ultimate inference of intent based on the improbability of the conduct." (Emphasis supplied.) *State v. Sadowski*, 247 Mont. 63, 72, 805 P.2d 537, 542-43 (1991). In *Sadowski*, 247 Mont. at 72-73, 805 P.2d at 543, quoting Edward J. Imwinkelried, Uncharged Misconduct Evidence § 5:05 (1984), the Montana court stated:

> " 'The doctrine teaches us that the more often the defendant performs the actus reus, the smaller is the likelihood that the defendant acted with an innocent state of mind. The recurrence or repetition of the act increases the likelihood of a mens rea or mind at fault. In isolation, it might be plausible that the defendant acted accidentally or innocently; a single act could easily be explained on that basis. However, in the context of other misdeeds, the defendant's act takes on an entirely different light. The fortuitous coincidence becomes too abnormal, bizarre, implausible, unusual, or objectively improbable to be believed. The coincidence becomes telling evidence of mens rea.' "

However, other commentators have harshly criticized the reasoning underlying the doctrine of chances. See, e.g., Andrew J. Morris, *Federal Rule of Evidence 404(B): The Fictitious Ban on Character Reasoning From Other Crime Evidence*, 17 Rev. Litig. 181 (1998); Paul F. Rothstein, *Intellectual Coherence in an Evidence Code*, 28 Loy. L.A. L. Rev. 1259 (1995). Rothstein argues that the only way to explain the supposed disparity between the chances, or probability, that an innocent person

would be charged so many times and the chances, or probability, that a guilty person would be so charged is the fact that a guilty person would have the propensity to repeat the crime. "If it were not for the propensity to repeat, the chances, or the probability, that an innocent person and a guilty person would be charged repeatedly would be identical." *Id.* at 1263. Likewise, Morris argues that the assumption underlying the "objective" probability of the doctrine of chances "necessarily depends—in a mathematically demonstrable manner—on the assumption that the defendant's character is unchanging." Morris, *supra*, at 201. Nonetheless, despite the apparently flawed reasoning underlying the doctrine of chances, the majority of courts have adopted the doctrine without question. See, e.g., *State v. Sullivan, supra*; *People v Crawford, supra*; *State v. Sadowski, supra*.

### (b) Factual Disparity

Even assuming that the doctrine of chances is the law in this jurisdiction, a matter we have never specifically addressed and do not now address, the facts of the instant case do not satisfy the doctrine's requirements. See, *State v. Sullivan, supra* (holding that two acts were not sufficiently similar when one consisted of verbal threats and other resulted in physical violence); *People v. Spoto*, 795 P.2d 1314 (Colo. 1990).

In *People v. Spoto, supra*, the Colorado Supreme Court addressed a similar set of facts. The defendant was found by a jury to be guilty of first degree murder. It was undisputed that the victim's death was caused by a bullet fired from the defendant's pistol when the muzzle of the gun was in contact with the victim's neck. At trial, the defendant testified that the victim had a gun, a struggle ensued, the defendant pulled his pistol, and his pistol accidentally discharged in the course of the continuing struggle. The defendant asserted that he acted in self-defense and that the killing was accidental rather than intentional.

The prosecution introduced evidence that the defendant had brandished his pistol on another occasion, which evidence was offered to rebut the defendant's claimed lack of intent. Only a few weeks prior to the killing, the defendant had accused his roommate of theft. The roommate denied the theft, so the defendant pointed his pistol at the roommate and asked,

" 'swear to God?' " *Id.* at 1317. The incident ended when the parties heard noises from another part of the house and went to investigate, discovering a burglar in the process of escaping.

The sole issue on appeal was the admissibility of the incident concerning the defendant's roommate. The court acknowledged that the evidence was logically relevant, since "[a]t minimum, the incident suggests that [the defendant] is the type of person who would pull a gun on someone when it is not necessary for self-defense." *Id.* at 1319. However, the court also recognized that this inference, although logically relevant, was based on improper propensity reasoning. The court noted that "[t]o be admissible, the prosecution must articulate a precise evidential hypothesis by which a material fact can be permissibly inferred from the prior act independent of the use forbidden by [rule 404(2)]." *Id.*

The *Spoto* court analyzed whether the doctrine of chances was sufficient to render the incident independently relevant. The court held that the application of the doctrine of chances was inappropriate for two reasons. *Id.* First, the court stated that the roommate incident was not similar enough to the charged incident to make the "objective statistical inference [because the roommate] was not shot and [the defendant] did not claim that he accidentally placed his gun to [the roommate]'s head." *Id.* at 1319-20. The doctrine of chances applies only when each of the other bad acts is similar to the charged offense and the defendant has been involved in such incidents more frequently than the typical person. *People v Crawford*, 458 Mich. 376, 582 N.W.2d 785 (1998). "Dissimilar prior acts are not probative under the doctrine of chances." *People v. Spoto*, 795 P.2d 1314, 1320 (Colo. 1990). Although there is generally no similarity of conduct requirement concerning other bad acts evidence, "similarity is crucial when the theory of logical relevance is the doctrine of chances." *Id.*

Second, the court noted that there was only one prior incident. *People v. Spoto, supra.* Generally, courts hold that the number of similar events that are necessary to satisfy the doctrine of chances depends upon the complexity, degree of similarity, and relative frequency of the event rather than on the total number of occurrences. See, *State v. Sullivan*, 216 Wis. 2d 768,

576 N.W.2d 30 (1998); *State v. Sadowski*, 247 Mont. 63, 805 P.2d 537 (1991). In *People v. Spoto, supra*, the court concluded that one similar instance was clearly insufficient given the lack of similarity between the two events.

The facts in the instant case are nearly identical to those in *Spoto*. First, although McManus allegedly held a pistol to Sherri's head, he did not pull the trigger, nor did he further threaten Sherri once she took the pistol from his hand. In contrast, the gun was fired in the incident involving Geiser, and Geiser was killed. Thus, the acts are distinctly lacking in similarity under the doctrine of chances. Indeed, one could argue that the fact that McManus did not pull the trigger when he put the pistol to Sherri's head bolsters his testimony that the killing of Geiser was accidental. Second, as in *Spoto*, only one prior incident was presented to the jury, and neither incident was particularly unusual or complex. See *State v. Sullivan, supra*.

Thus, even if this court were to adopt the doctrine of chances, the bad act evidence in the instant case was insufficient to support the required inference of objective improbability. We conclude that the other bad act evidence was not offered for a proper purpose under rule 404(2) and, therefore, was erroneously admitted by the trial court.

### 6. HARMLESS ERROR

This court's having determined that the evidence was erroneously admitted, the question now becomes whether the admission of the evidence was harmless beyond a reasonable doubt. See *State v. Buechler*, 253 Neb. 727, 572 N.W.2d 65 (1998). In *People v. Spoto, supra*, the court addressed whether the erroneous admission of the gun-pulling act involving the defendant's roommate was harmless error. The court noted that the defendant had told a seemingly plausible story. The court also noted that the facts concerning the incident were clearly in dispute and, therefore, whether the jury believed the defendant's account of the incident was critical to the outcome of the case. Accordingly, the court held that the potential for prejudice was "overwhelming" and that the error was not harmless. *People v. Spoto*, 795 P.2d at 1321.

Likewise, in the instant case, the evidence concerning Geiser's death was in dispute. In effect, the State's entire case against McManus was circumstantial in nature, since McManus was the only witness to the crime to testify at trial. As with the defendant in *Spoto*, whether the jury believed McManus' story was critical. By presenting evidence giving rise to the inference that McManus was the kind of person who was prone to point his pistol and make threats, the State cast grave doubt on McManus' credibility. Faced with such evidence, the jury could be tempted to infer bad character and action taken in conformity with that character and could thus reach a verdict on an improper basis.

Therefore, we conclude that the erroneous admission of the other bad act evidence in the instant case was not harmless.

## V. CONCLUSION

We conclude that the trial court erroneously admitted evidence of McManus' other bad act for an improper purpose and that the admission of this evidence was not harmless error. Accordingly, we reverse, and remand for a new trial in accordance with this opinion.

REVERSED AND REMANDED FOR A NEW TRIAL.