STATE OF NEBRASKA, APPELLEE, V.
HAROLD JAY TROTTER, APPELLANT.

632 N.W. 2d 325

Filed August 17, 2001.   No. S-00-487.

Steven E. Achelpohl for appellant.

Don Stenberg, Attorney General, and Barry Waid for appellee.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

GERRARD, J.

## I. INTRODUCTION

Harold Jay Trotter was convicted of child abuse, child abuse resulting in death, and manslaughter of Christopher Churchill, the son of Tammy Churchill, Trotter's girl friend at the time of Christopher's death. The main issue on appeal is whether the trial court committed reversible error when it allowed evidence of prior bad acts relating to Trotter and his ex-spouses at trial. Trotter argues that such evidence is inadmissible under Neb. Evid. R. 404(2), Neb. Rev. Stat. § 27-404(2) (Reissue 1995), because the only purpose for such evidence was an improper purpose, i.e., to show Trotter's propensity to commit the crimes charged.

## II. BACKGROUND

In September 1996, Tammy became acquainted with Trotter and began dating him. Tammy would sometimes stay at Trotter's home with Christopher, who was born on August 7, 1995, until Christopher's death on November 28 or 29, 1996.

Tammy testified that on one occasion, she and Christopher were spending the night at Trotter's apartment and that at approximately 3 a.m., she decided to go to her apartment because Christopher would not stop crying. Tammy was preparing to leave the apartment and had put Christopher on the bed next to Trotter. Tammy testified that Christopher began screaming louder and that when Tammy turned to look, Christopher was grabbing his face. Tammy stated that when she asked what happened, Trotter told her that he had rolled over, not realizing how close Christopher was to him, and had accidentally hit Christopher with his hand.

Between November 8 and 11, 1996, Christopher lost a tooth. Tammy testified that Trotter came downstairs from Christopher's room on that evening and told her that there was

blood in Christopher's crib. Trotter told Tammy that he had things under control and that she should not go upstairs to check on Christopher because Trotter was getting Christopher to calm down. Tammy said that when Trotter came down again, he had Christopher's tooth. Trotter later informed Tammy's mother that Christopher had lost his tooth; that it had bled, but Trotter had the bleeding under control; and that Trotter thought the tooth loss was due to Christopher's gritting his teeth.

In November 1996, Christopher developed an infection in the area of his mouth and was taken to see Dr. Jonathan Stalling on November 18 by Tammy and her mother. Christopher was admitted to the local hospital in Nebraska City and was treated for what Stalling described as a severe infection. During Christopher's hospital stay, Stalling noted various contusions and lesions over Christopher's body. Stalling testified that in his opinion, the infection around Christopher's mouth was secondary and caused by some other occurrence.

Paula Aldana, a nurse who interacted with the Churchills while Christopher was in the hospital, testified that at one point during Christopher's hospitalization, it was difficult to get Tammy to help take care of Christopher. Aldana said that Tammy was lying on a bed near Christopher's crib when Christopher was awakened to take his vital signs. Aldana said that Tammy continued lying on the bed and did nothing when Aldana asked her to help with Christopher.

Prior to Christopher's release from the hospital on November 21, 1996, Stalling contacted the then Department of Social Services (DSS) and a plan was worked out for DSS' involvement with Tammy and Christopher. Included in the plan was the requirement that Tammy would bring Christopher in to see Stalling the next week, Wednesday, November 27, for a checkup. On November 25, Darci Merk, a DSS caseworker, visited Tammy at Tammy's home. Merk testified that when she went to Tammy's home, Merk had somewhat of a confrontation with Tammy, that Tammy did not want Merk there, and that Tammy was somewhat resistant to DSS' involvement in her life. However, Tammy brought Christopher to see Stalling on November 27 as scheduled, and Stalling testified that Christopher had improved, that the healing process was progressing normally, and that Christopher did

not appear to have any new injuries. Merk testified that she visited Tammy again on November 27 and that Tammy was very compliant. Merk said that there were family support workers and a therapist scheduled to be in Tammy's home approximately 20 hours per week to help educate Tammy in parenting skills. Merk stated that followup visits had been scheduled with these providers for November 29 as well as December 1.

On November 28, 1996, Thanksgiving Day, Tammy woke up early to get another of her sons, K.L., from the father's home in Hamburg, Iowa, so that K.L. could accompany Tammy to Tammy's parents' home for Thanksgiving dinner. Tammy testified that she left Christopher at Trotter's apartment for approximately 45 minutes to an hour and that when she returned to Trotter's apartment, Trotter and Christopher were sleeping. When she woke them up, Trotter told her that while she was gone, Christopher came into the living room and had accidentally fallen against the wall heater in the living room and burned his face. In an interview with the police after his arrest on November 29, Trotter maintained that he was alone in the apartment with Christopher when Christopher's face was burned. Trotter also stated that after Christopher burned his face, Trotter put cold water on the burns and put Christopher back to bed.

Tammy, Christopher, and K.L. went to Tammy's parents' house for Thanksgiving dinner at about 10 a.m. on Thanksgiving Day. Tammy's mother testified that after the family gathering, she took Tammy and Christopher to Trotter's apartment at around 4:30 p.m. Trotter told the police that he had run a few errands early in the evening on Thanksgiving Day after Tammy returned and was gone for approximately 30 minutes. Trotter also told the police that at approximately 11 p.m., Christopher woke up and Trotter changed Christopher's diaper. Trotter stated that he did not see Christopher after changing his diaper until the next day at around 1 p.m. when Tammy told Trotter that Christopher was not breathing.

Tammy testified that on Thanksgiving evening, Trotter went to a friend's house for a few minutes and after returning at 9 or 10 p.m., Trotter went in to check on Christopher. Tammy said that Trotter went into Christopher's room with a bowl of water and paper towels. When she asked what he was doing, Trotter

told her that he was changing Christopher's diaper. Tammy also testified that she heard a "thump" sound while Trotter was in the bedroom changing Christopher's diaper but that the sound was nothing to cause alarm. Tammy also said that she heard Trotter say he was sorry shortly after the "thump" sound and that Christopher then calmed down.

Trotter later told the police that sometime between 11 p.m. on November 28 and 8 a.m. on November 29, 1996, he was half asleep and heard Tammy moving around with Christopher in Christopher's room. Trotter said that Christopher was whining and that Trotter could hear a noise that sounded like Tammy throwing the covers over Christopher or something rolling around.

Trotter also told the police that he woke up at approximately 8 a.m. on November 29, 1996, and left Tammy and Christopher alone at the house for about an hour. Tammy testified that Trotter was gone when she woke up on November 29 and that Trotter was in and out all morning but was there by 11:30 a.m. Patrick Wright, a coworker of Trotter's, testified that Trotter had visited him on November 29 at approximately 8:30 or 9:30 a.m. Wright testified that Trotter said Christopher had kept him up all night the previous night and that Trotter was not getting along with Tammy. Wright stated that while working with Trotter sometime during the 2 weeks before Christopher's death, Trotter had told Wright that DSS was trying to help Tammy, that DSS was an obstacle to his relationship with Tammy, and that he was tired of it.

Aldana, a nurse who had helped care for Christopher while Christopher was in the hospital, testified that she saw Tammy at a grocery store in Nebraska City between 12:30 and 12:50 p.m. on November 29, 1996. There was also a cash register receipt and other evidence presented which inferred that Tammy had used food stamps at the store that day at 12:56 p.m.

Trotter told police that he was napping in the early afternoon of November 29, 1996, when Tammy woke him. Tammy told Trotter that Christopher was not breathing. Trotter told police that he put his ear to Christopher's chest and discovered that Christopher was cold and had no heartbeat. Trotter stated that at that point, he knew Christopher was dead. Trotter told police that Tammy wanted to call her mother after Trotter checked on

Christopher. Trotter gave Tammy and Christopher a ride to a pay telephone where Tammy called her mother and asked her to come to Tammy's apartment. Trotter took Tammy to her apartment, and he told police that he left Tammy alone there with Christopher because he had to run some errands. Tammy's mother picked Tammy and Christopher up at Tammy's apartment, and they went to the hospital. Stalling, who was working at the hospital when they arrived, testified that Christopher was cold and that efforts to resuscitate Christopher failed.

Dr. Jerry Jones, a forensic pathologist, performed an autopsy on Christopher. Jones determined that the cause of Christopher's death was a blunt force injury to the head, resulting in an acute subdural hematoma, brain swelling, and a compression of the brain stem. Jones further opined that Christopher's head had been slammed against a hard surface one or more times to produce the fatal injuries. Jones stated that Christopher had suffered the fatal injuries within 24 hours of his death and that shortly after the injuries were sustained, Christopher would have exhibited a progressive decrease in consciousness and activity. Jones observed multiple external injuries to Christopher's head, all the result of the blunt force impact, as well as multiple bruises and abrasions of the cheeks and around the left eye.

Jones testified that he thought Christopher's tooth loss was the result of blunt force to the central part of Christopher's face. Jones testified that there were other injuries to Christopher's teeth and mouth beyond the lost tooth. Jones said that one of Christopher's upper teeth had been dislodged forward and into the gum, causing a laceration of the gum. There was also a tear of the gum tissue over the area where Christopher had lost his tooth, indicating the blunt force trauma. Jones stated that there is no question that the injuries to the teeth and mouth were the result of some blunt force to the area and that he also thought all of those injuries had occurred approximately 2 weeks prior to Christopher's death.

Jones also testified at trial that the burns on Christopher's face, which extended from the midforehead down to the chin, were very significant. Jones stated that the pattern of the burn conformed exactly in size and configuration to the front of the heater grate that was taken from Trotter's living room. There

were also pattern burns present on the outside of Christopher's forearms, which matched the pattern of the heater grate. Jones said that while the burns to Christopher's face and his right forearm extended into a partial thickness of the skin, the burn to his left forearm extended down to the subcutaneous fat.

In Jones' opinion, the burns to Christopher's face were sustained as a result of his face being pushed into and held against the front of the heater grate. The size and pattern of the burns as well as their thickness and deepness, as opposed to thin, burned lines, indicate force was used to force Christopher's face into Trotter's heater grate. Not only were the raised points on Christopher's face burned, but the recessed areas that would normally not have come into contact with the grate—the bridge of the nose, the undersurface of the nose, the undersurface of the lips—were also burned. Jones testified that these areas would have been burned only if Christopher's face had been forced or pushed against the heater grate. Jones testified that the burns on Christopher's forearms indicated that Christopher had used his arms as a defense mechanism to push away from the heater grate in an attempt to prevent himself from being burned. Jones testified that the burns on the forearms lined up exactly with the size and configuration of the heater grate when Christopher's face was positioned in front of the heater grate and Christopher's forearms were positioned in front of him.

Additionally, Dr. John McGreer, a radiologist, testified that upon examination of x rays taken of Christopher's leg after his death, there appeared to be a leg fracture that was approximately 1 month to 6 weeks old.

Trotter was arrested on November 29, 1996, in connection with the death of Christopher. The day of Trotter's arrest, the police searched Trotter's house with Trotter's consent. During the search, Sgt. David Lacy of the Nebraska City Police Department asked how Trotter disposed of his garbage. Trotter showed Lacy two trash cans next to a garage behind Trotter's house and indicated that the empty trash can was his and that the full trash can belonged to his neighbor. Lacy opened the garbage bag in the full trash can and discovered a discarded diaper on top. When Lacy asked Trotter whose diaper it was, Trotter responded that it was his neighbor's and then Trotter walked away from

Lacy toward the house. Upon further investigation of the full garbage bag, Lacy discovered a piece of paper with the name of a coworker of Trotter's written on it. Lacy also discovered paper towels in the garbage bag with what appeared to be bloodstains on them. Lacy took the garbage bag to the hospital and had the hospital run tests to see if the stains were bloodstains.

In an audio recorded interview with the police on November 29, 1996, Trotter admitted that he used both of the trash cans behind his house. When the interviewing officer asked Trotter about some paper towels with bloodstains on them in one of the trash cans, Trotter volunteered that it was probably from wiping Christopher's mouth because Christopher's mouth would bleed now and then. The audio recording of the interview was played for the jury at trial. Additionally, Trotter's neighbor testified that Trotter used the trash can in question.

Trotter was charged with the following: count I, child abuse resulting in death for the events occurring after 1 p.m. on November 28 or on November 29, 1996; count II, manslaughter of Christopher occurring after 1 p.m. on November 28 or on November 29; and count III, child abuse resulting in serious bodily injury for the events occurring between 12 a.m. and 1 p.m. on November 28. The jury found him guilty of all three counts, and he was sentenced to the following on each of the above counts: count I, 25 years' to life imprisonment; count II, 20 years' imprisonment to run concurrently with count I; and count III, 5 to 12 years' imprisonment to run consecutively to the sentences imposed in counts I and II.

Initially, Trotter failed to perfect an appeal due to ineffective assistance of Trotter's trial counsel. *State v. Trotter*, 259 Neb. 212, 609 N.W.2d 33 (2000). This court ordered reinstatement of Trotter's direct appeal as a result of Trotter's successful action for postconviction relief. See *id.*

## III. ASSIGNMENTS OF ERROR

Trotter assigns, renumbered and restated, that the district court erred in (1) failing to require the State to identify the specific purposes for which other crimes or bad acts evidence was to be offered in this case under the rule of *State v. Sanchez*, 257 Neb. 291, 597 N.W.2d 361 (1999); (2) refusing to suppress

before trial, and in admitting into evidence at trial, other crimes or bad acts evidence involving Trotter and his ex-spouses, under Neb. Evid. R. 403, Neb. Rev. Stat. § 27-403 (Reissue 1995), and rule 404 of the Nebraska rules of evidence; (3) refusing to suppress before trial, and admitting at trial, evidence regarding Trotter's hitting and otherwise abusing Christopher prior to November 1996 under rules 403 and 404 of the Nebraska rules of evidence; and (4) admitting over Trotter's foundational objection the expert testimony of a Nebraska State Patrol criminal investigator concerning the spatter pattern of blood alleged to be that of Christopher.

## IV. STANDARD OF REVIEW

In all proceedings where the Nebraska Evidence Rules apply, admissibility of evidence is controlled by the Nebraska Evidence Rules, not judicial discretion, except in those instances under the rules when judicial discretion is a factor involved in determining admissibility. *State v. Burdette*, 259 Neb. 679, 611 N.W.2d 615 (2000). Because the exercise of judicial discretion is implicit in Neb. Evid. R. 401, Neb. Rev. Stat. § 27-401 (Reissue 1995), it is within the discretion of the trial court to determine relevancy and admissibility of evidence of other wrongs or acts under rules 403 and 404(2), and the trial court's decision will not be reversed absent an abuse of discretion. *State v. Burdette, supra.*

## V. ANALYSIS

### 1. PRIOR BAD ACTS INVOLVING TROTTER AND HIS EX-SPOUSES

Trotter assigns that the district court erred in refusing to suppress before trial, and in admitting into evidence at trial, the testimony of his ex-spouses that they had been physically abused by Trotter while married to him.

Before Trotter's trial, the State indicated its intent to offer prior bad acts evidence involving Trotter and his ex-spouses. A hearing was held pursuant to rule 404 (404 hearing) to determine whether the alleged acts had occurred. After the 404 hearing, the district court determined that evidence of Trotter's physical abuse of his two ex-spouses would be admissible at trial. Trotter's ex-wives both testified at the 404 hearing.

At the 404 hearing, Lynette Molczyk testified that she married Trotter in 1981 and that the couple was divorced in 1985. Molczyk testified that Trotter was physically violent with her during their marriage, starting the first month they were married and continuing almost on a monthly basis. In one incident, Trotter hit Molczyk in the face, breaking her glasses. In another, he pushed her down the steps as she was attempting to leave their house, causing scrapes and bruises. Molczyk testified that there were approximately five instances when Trotter grabbed Molczyk by the neck, which caused bruising. Additionally, Molczyk stated that in the summer of 1985, Trotter found Molczyk in a Wal-Mart store and pushed a shopping cart into Molczyk's back. Molczyk also testified that the son she had with Trotter has never complained about Trotter's striking, hitting, or abusing him.

Trotter's second wife, Sharena Gayman, testified at the 404 hearing that she was married to Trotter from December 1987 until December 1993. Gayman stated that in the spring of 1992, she returned home from a work-related trip late one night and that Trotter started to argue with her. Gayman tried to leave the house, but before she could get to her company van, Trotter grabbed her and threw her up against the side of the van, hurting Gayman's shoulder. Gayman also testified that on a couple of other occasions, Trotter shoved her but never hit her. Additionally, Gayman said that she and Trotter were arguing on one occasion and that when she tried to leave, he prevented her from getting in her car and, while in his pickup truck, chased her around their yard and the neighbor's yard for approximately 20 minutes. Gayman also testified that Trotter never, in any way, hit, struck, or threatened her children, who were living with her and Trotter during their marriage.

During the 404 hearing, the prosecutor urged that Trotter's history of domestic violence should be admissible at trial "to show this man's violent tendencies towards the people living in his household." The district court determined that the evidence would be admissible at trial.

In the district court's order on the admissibility of the evidence of other bad acts involving Trotter and his ex-spouses, the court found that the acts described and the injuries sustained by Trotter's ex-wives were sufficiently similar to the acts committed

against Christopher to allow them at trial. The court found that the acts against Trotter's ex-wives would be similar to those committed against Christopher because, in both cases, the acts were against someone living with Trotter, Trotter had superior strength and size, there were injuries to the facial area, parties were grabbed by the neck, and the individuals injured should have been considered loved ones by Trotter. Further, the court noted that Trotter's bad acts against his ex-wives "would appear to be relevant to a jury for consideration of such things as enumerated by §27-404(2), such as motive, opportunity, intent, identity and lack of accident or mistake."

■ Initially, we address the State's argument that Trotter is precluded from arguing that the admission of such testimony was error. During opening statements at trial, Trotter's attorney mentioned that there would be testimony during trial regarding physical contact by Trotter on his two ex-wives. The State argues that because Trotter mentioned the possible testimony during opening statements, Trotter is precluded from arguing on appeal that it was error for the district court to allow such evidence at trial. While we have not addressed the issue whether opening statements constitute evidence in the criminal context, we have stated, in the civil context, that declarations made in opening statements cannot be used as evidence in deciding a case. *King v. Crowell Memorial Home*, 261 Neb. 177, 622 N.W.2d 588 (2001).

Other jurisdictions have held that assertions made by the defendant's counsel during opening statements in a criminal action are not evidence. See, *McIntyre v. State*, 717 N.E.2d 114 (Ind. 1999); *State v. Tevay*, 707 A.2d 700 (R.I. 1998); *State v. Donovan*, 698 A.2d 1045 (Me. 1997); *State v. Faison*, 330 N.C. 347, 411 S.E.2d 143 (1991); *Cooper v. Com.*, 31 Va. App. 643, 525 S.E.2d 72 (2000); *Bynum v. Com.*, 28 Va. App. 451, 506 S.E.2d 30 (1998). See, also, *State v. McCorkendale*, 267 Kan. 263, 979 P.2d 1239 (1999) (opening statements by prosecutor in criminal prosecution are not evidence). Compare *Ohler v. United States*, 529 U.S. 753, 120 S. Ct. 1851, 146 L. Ed. 2d 826 (2000) (defendant who preemptively introduces evidence of prior conviction on direct examination, after in limine ruling allowing such evidence at trial for impeachment purposes, may not challenge admission of such evidence on appeal).

In *State v. Donovan*, 698 A.2d at 1048, the court held that the defendant's opening statements did not " 'open the door' " for rebuttal by the prosecution to evidence never brought out by the defendant at trial. The court stated that " '[a] distinction exists between assertions made by counsel in an opening statement and the testimony of witnesses during trial. The latter is evidence; the former is not.' " *Id.* In *Bynum v. Com.*, 28 Va. App. at 458-59, 506 S.E.2d at 34, the court stated that "statements made during an opening statement are not evidence; therefore, opening statements may not 'open the door' to otherwise inadmissible evidence." We agree and determine that comments made by counsel during opening statements in a criminal prosecution are not evidence.

Therefore, comments made by Trotter's counsel during opening statements regarding the testimony of Trotter's former spouses were not evidence. As a result, Trotter did not waive his objection to the admission of evidence at trial of other bad acts involving Trotter and his former spouses, nor is Trotter precluded from arguing on appeal that such evidence was improperly admitted at trial.

Next, we address Trotter's first assignment of error on appeal: The district court erred by not informing the jury as to the specific purpose for which the prior bad acts evidence was admitted in this case pursuant to our ruling in *State v. Sanchez*, 257 Neb. 291, 597 N.W.2d 361 (1999).

At trial, after Trotter objected to the introduction of Molczyk's testimony, the district court instructed the jury in the following manner:

> The jury is instructed that the witness will be allowed to testify regarding prior acts allegedly committed by the defendant on the witness. You're instructed that this testimony is not admitted to prove the character of the defendant to show that he acted in conformity therewith, but rather is being admitted for the limited purpose of evidence as to proof of motive, intent, knowledge, identity, or absence of mistake or accident regarding the offenses for which the defendant stands charged in this case.

The court also gave an almost identical instruction to the jury after Trotter objected to the introduction of Gayman's testimony.

In *State v. Sanchez, supra,* we held that a trial court is to state the specific purposes for admission of evidence under rule 404(2). The trial court in this case clearly did not state the specific purpose for which the rule 404(2) evidence was being admitted. Indeed, the district court merely cited the list of possible purposes for admitting such testimony as found in rule 404(2). See *State v. Sanchez, supra.* However, Trotter's trial occurred in October 1997 and, as we held in *State v. Dreimanis,* 258 Neb. 239, 603 N.W.2d 17 (1999), the rule set forth in *State v. Sanchez, supra,* is to be applied prospectively from the date of our decision in *Sanchez,* which was July 16, 1999. Therefore, the trial court's failure to state the specific purpose for which the prior bad acts evidence was admitted did not constitute reversible error because Trotter's trial occurred prior to our ruling in *Sanchez.*

We next turn to the substantive rule 404 issue presented in the instant appeal. Before the prosecution may offer evidence of other crimes, wrongs, or acts pursuant to rule 404(2), it must first prove to the trial court, out of the presence of the jury and by clear and convincing evidence, that the accused committed the crime, wrong, or act. *State v. Sanchez, supra.* Trotter does not specifically argue on appeal that the State failed to prove by clear and convincing evidence that he physically abused his ex-wives. Therefore, we do not address this issue.

The admissibility of what has been described as "other crimes" or "similar acts" evidence is governed by rule 404(2), which provides:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he or she acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

See *State v. Sanchez, supra.*

It is axiomatic that only relevant evidence is admissible. *State v. Sanchez,* 257 Neb. 291, 597 N.W.2d 361 (1999). Evidence is relevant when it has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. *Id.; State v. McManus,* 257 Neb. 1, 594 N.W.2d

623 (1999). However, rule 404(2) prohibits the admissibility of relevant evidence for the purpose of proving the character of a person in order to show that he or she acted in conformity therewith. *State v. Sanchez, supra.* Stated another way, rule 404(2) prohibits the admission of other bad acts evidence for the purpose of demonstrating a person's propensity to act in a certain manner. The reason for the rule is that such evidence, despite its relevance, creates the risk of a decision by the trier of fact on an improper basis. *State v. Sanchez, supra.* The exclusion of other bad acts evidence offered to show a defendant's propensity protects the presumption of innocence and is deeply rooted in our jurisprudence. *Id.*

An appellate court's analysis under rule 404(2) considers whether the (1) evidence was relevant for some purpose other than to prove the character of a person to show that he or she acted in conformity therewith, (2) probative value of the evidence is substantially outweighed by its potential for unfair prejudice, and (3) trial court, if requested, instructed the jury to consider the evidence only for the limited purpose for which it was admitted. *State v. Sanchez, supra.*

Therefore, we first consider whether the evidence of prior bad acts was relevant for some purpose other than to show Trotter's propensity to commit the crimes charged in the instant case. See *State v. McManus, supra.* The purpose for which the district court allowed evidence of Trotter's acts against his ex-wives is not clear from the record. During the pretrial 404 hearing, the prosecutor argued that Trotter's history of domestic violence is admissible "to show this man's violent tendencies towards the people living in his household." In the district court's pretrial order allowing such evidence to be used at trial, the district court found that the evidence would be admissible to show motive, opportunity, intent, identity, and lack of accident or mistake. Because the district court did not state a specific purpose for which the bad acts evidence was admitted, we will consider only those purposes for the bad acts evidence which are urged in the State's brief. See *State v. Sanchez, supra.* The State's arguments in its brief relate mostly to identity. However, the State also appears to assert that the evidence was properly admitted to show intent, motive, and absence of mistake or accident. Thus,

we will consider intent, motive, identity, and absence of mistake or accident as possible purposes for admitting the evidence.

### (a) Intent

In the case at bar, the State's argument relating to intent is that Trotter's prior acts were relevant because his previous acts of willful abuse were similar to those inflicted upon Christopher. The State does not indicate why the similarity between the acts involving his ex-wives and the acts in the instant case demonstrate Trotter's intent, only that Trotter's prior bad acts are similar to the events surrounding Christopher's death. The State suggests that Trotter's intent to harm Christopher in the instant case is shown by Trotter's use of his superior size and strength to physically intimidate and control his ex-spouses.

In *State v. McManus*, 257 Neb. 1, 594 N.W.2d 623 (1999), we were faced with a situation in which the defendant, on a prior occasion and in the crime charged, had been drinking at a bar, became intoxicated and angry, and used a gun to intimidate another individual. The State argued that evidence of the prior act was admissible to show his intent because the two occurrences were factually similar. *Id.* We noted that the most obvious reason why the similarities between the two acts showed intent is the inference that the defendant was the type of person who acts with violent intent when he is angry. *Id.* We held that such analysis is classic propensity reasoning and that the evidence must be excluded under rule 404(2). *State v. McManus, supra.*

In the instant case, the State's argument is essentially the same as the State's argument was in *McManus*: The evidence of Trotter's prior violence with respect to his ex-spouses is relevant to show that he is the type to act with violent intent when he wants to control someone smaller and weaker than he is. Because this is classic propensity reasoning, the evidence may not be used to show Trotter's intent in the crime charged. See *id.*

### (b) Motive

The State argues that Trotter's motive in this case would be similar to his motive in abusing his ex-wives in that he used his superior size and strength to control the behavior of the other person. In *State v. Phelps*, 241 Neb. 707, 490 N.W.2d 676 (1992), we addressed a situation in which the defendant was

charged with and convicted of kidnapping a 9-year-old girl who disappeared and was never found. The State introduced evidence of six prior acts of sexual contact by the defendant with young girls. We held that such evidence was admissible to show motive in that case. *Id.* We reasoned: "That the [victim]'s clothing was found at a secluded place suggests a sexual motive for the abduction; thus, the evidence of Phelps' prior acts is clearly relevant as tending to show his motive for kidnapping [the victim], that is, to achieve sexual gratification through assaulting her." *Id.* at 721, 490 N.W.2d at 687.

In the case at bar, however, the State does not indicate why the prior acts relating to Trotter and his ex-wives would show his motive to commit the crimes charged. The State's proffered reason for admitting such testimony, that he was motivated to use his superior size and strength to control the victims, describes what he did, not his motive for doing so. The State improperly attempts to show that because Trotter may have been motivated to control his ex-wives through the use of his superior size and strength, he was likely to use his superior size and strength to control another person. Such focus on Trotter's actions as opposed to the motive is impermissible propensity reasoning under rule 404(2). Essentially, the State reasons that this evidence proves Trotter's character—that Trotter used his superior size and strength in the past—in order to show that he acted in conformity with that character. See *State v. Sanchez*, 257 Neb. 291, 597 N.W.2d 361 (1999). Therefore, the evidence is not admissible to show Trotter's motive.

### (c) Identity

Other acts evidence may have probative value as to identity where there are overwhelming similarities between the other crime and the charged offense or offenses, such that the crimes are so similar, unusual, and distinctive that the trial judge could reasonably find that they bear the same signature. *State v. Burdette*, 259 Neb. 679, 611 N.W.2d 615 (2000). In evaluating other acts evidence in criminal prosecutions, the other act must be so related in time, place, and circumstances to the offense or offenses charged so as to have substantial probative value in determining the guilt of the accused. *Id.*

In the district court's pretrial order, it stated the following with respect to the similarities between the evidence of Trotter's prior bad acts relating to his ex-wives and the circumstances surrounding Christopher's death:

The injuries described by the Defendant's two ex-wives had some similarities to the injuries sustained by Christopher, resulting in his death as described by Dr. Jerry Jones. There were injuries to the facial area, including around an eye, and injuries around the throat, where it appeared that Christopher had been grabbed. The acts described by the Defendant's two ex-wives were committed against people who were living with the Defendant. In the instant case, Christopher was, for the most part, living at the same residence as the Defendant. The acts perpetrated by the Defendant on his two ex-wives would have been against individuals smaller and weaker than the Defendant, and ones which the Defendant should have considered to have been loved ones. In the present instance, Christopher was a small child approximately one-and-one-half years of age. The acts employed by the Defendant against his ex-wives would be evidence of a motive, or intent to control, his ex-wives by the use of his superior size and strength. This would be similar to his ability to be able to control, or attempt to control, Christopher by using his superior size and strength to control or correct behavior of Christopher.

In *State v. Burdette, supra*, we determined that it was not error to admit evidence of prior sexual assaults when the crime charged was sexual assault and the similarities between the assault charged in that case and the evidence of prior assaults were quite significant. We found that the fact that the assailant chose victims whose names had been featured in articles identifying them as women who would likely be living alone was unusual and distinctive such that it could be said that the previous sexual assaults and the crimes charged in that case bore the same signature. *Id.*

In *State v. Freeman*, 253 Neb. 385, 571 N.W.2d 276 (1997), the defendant was charged with eight counts of sexual assault. Evidence was presented at trial regarding another attempted

sexual assault of which the defendant was later convicted. *Id.* The defendant had attacked the victim of the assault at issue as she was attempting to enter her apartment building. The assailant, who was wearing dark clothing, pinned her to the ground and lay on top of her. He displayed a knife and told her that if she did not shut up, he was going to kill her. He told her that she was going to go with him, but he fled after being scared by two witnesses. In all of the eight charged assaults, the defendant in *Freeman* would surprise his victims and attack them while they were alone. The defendant would generally tell his victim to shut up or he would kill her, and the defendant often wielded or displayed a knife. *Id.* We found that the evidence of the defendant's other bad acts tended to show the defendant's identity and method of operation because of the similarities between the crimes charged and the other incident. *Id.* In doing so, we noted that the other attempted sexual assault occurred within 16 days of three of the eight sexual assaults the defendant was charged with in *Freeman*.

We cannot say that the crimes charged and the evidence of Trotter's previous acts in this case are so similar, unusual, and distinctive that the trial judge in this case could reasonably find that they bear the same signature. The evidence of the manner in which Trotter may have abused his ex-spouses is similar to the extent it constituted abuse. While the acts of child abuse and spousal abuse are concededly similar in nature in that they both involve the abuse of a person, the facts described by the district court and the State could be present in most any situation where there is any type of abuse. The similarities the State points to in the case at bar are, in essence, the similarities in the statutory definition of the crimes themselves, not the manner in which Trotter may have carried them out.

In order to be relevant to show intent, the incidents involving the previous act, not the nature of the previous act, must be so similar, unusual, and distinctive that the trial judge could reasonably find that they bear the same signature. In this case, the State essentially asks us to adopt a rule in which evidence of prior abuse would always be admissible in a criminal trial where the crime charged is some sort of physical abuse, regardless of the facts surrounding the prior abuse. We decline to adopt such a rule because such evidence, without factual circumstances sufficient to show

that the crimes bear the same signature, would be relevant only to show the defendant's propensity to commit the crime charged.

(d) Absence of Mistake or Accident

In *State v. Stephens*, 237 Neb. 551, 466 N.W.2d 781 (1991), we addressed a situation where evidence of prior bad acts was admitted to show absence of mistake or accident. In *Stephens*, the defendant's attorney questioned the victim's physician about the possibility that the victim's injury could accidentally have been caused by an inexperienced person, such as the defendant, changing the victim's diaper or cleaning her. We determined that the evidence of the defendant's prior sexual contacts with a 4- or 5-year-old girl in his care was relevant to negate the inferences the defendant sought to raise. We further found that the evidence was relevant to show both the identity of the assailant as being the defendant and the absence of mistake or accident on his part. *Id.*

In the case at bar, Trotter has not asserted that the death of Christopher was the result of an accident or mistake. Thus, the evidence of Trotter's physical abuse of his ex-wives is not admissible to show that Christopher's death was not an accident or mistake because accident or mistake was not at issue. However, on the charge of child abuse resulting in serious bodily injury, Trotter did assert that the burns to Christopher's face were the result of Christopher's accidentally falling against the heater in Trotter's living room. Regardless, the only purpose for admitting the testimony of Trotter's ex-spouses was to show Trotter's propensity for abusing Christopher, not to show that Christopher had not accidentally fallen against the heater. In other words, the evidence was not admitted to show that Trotter had not accidentally caused the injuries to Christopher's face; rather, it was admitted to show that Trotter's character was that of one who abuses people in general. This is improper propensity reasoning, and Trotter's ex-spouses' testimony was not admissible to show lack of accident or mistake.

We determine that the evidence relating to Trotter's physical abuse of his ex-wives was not admitted for a proper purpose under rule 404(2). The incidents involving Trotter's ex-spouses occurred between 1981 and 1985 and in 1992, or between 4 and

15 years prior to Christopher's death in 1996. Indeed, the prosecutor's statement at the 404 hearing was the exact reason the evidence was admitted at trial: that Trotter's history of domestic violence was admissible "to show this man's violent tendencies towards the people living in his household." The evidence was improperly admitted to show Trotter's propensity to commit the crimes charged. Therefore, the district court abused its discretion in admitting such evidence at trial.

## 2. HARMLESS ERROR

Having concluded that the district court erred in admitting evidence of the prior bad acts relating to Trotter and his ex-spouses, we must now determine whether the error was harmless beyond a reasonable doubt. See *State v. McManus*, 257 Neb. 1, 594 N.W.2d 623 (1999). We will focus our analysis on whether admitting such evidence was harmless with respect to Trotter's conviction on each count. Harmless error exists in a jury trial of a criminal case when the court makes an erroneous evidential ruling which, on review of the entire record, did not materially influence the jury in a verdict adverse to the defendant. *State v. Rieger*, 260 Neb. 519, 618 N.W.2d 619 (2000). Harmless error review looks to the basis on which the jury actually rested its verdict; the inquiry is not whether in a trial that occurred without the error a guilty verdict would surely have been rendered, but, rather, whether the actual guilty verdict rendered in the questioned trial was surely unattributable to the error. *State v. Baue*, 258 Neb. 968, 607 N.W.2d 191 (2000).

### (a) Count III

We find that the admission of Trotter's ex-spouses' testimony was harmless beyond a reasonable doubt with respect to Trotter's conviction on count III—child abuse resulting in serious bodily injury. Count III related to the morning of November 28, 1996, the time period in which Christopher sustained burns to his face and forearms. Throughout Trotter's taped police interviews, which were played at trial, Trotter maintained that he was alone with Christopher when Christopher sustained the burns to his face and forearms. Tammy also testified that she left Christopher and Trotter alone on the morning of November 28

to get her son K.L. and that when she returned to Trotter's residence, Trotter informed her that Christopher had been burned. Further, Jones opined that the burns to Christopher's face and forearms were too severe to have been accidental. Also, Jones testified that the nature of the burns on Christopher's forearms indicated that Christopher must have tried to push away from the heater with his forearms while someone pushed his face into the heater grate.

It is true that Trotter stated that Christopher accidentally fell against the heater grate; however, given the fact that Trotter maintained that he was alone with Christopher when Christopher was burned and given the nature of Jones' testimony, we determine that the conviction on count III was surely unattributable to any of the testimony of the ex-spouses. Therefore, the erroneous admission of Trotter's ex-spouses' testimony was harmless beyond a reasonable doubt.

### (b) Counts I and II

Based upon our review of the entire record in this case, we cannot conclude that the erroneous admission of evidence was harmless beyond a reasonable doubt with respect to counts I and II (child abuse resulting in death and manslaughter, respectively); i.e., that Trotter's guilty verdicts on counts I and II were surely unattributable to the admission of his ex-spouses' testimony. While the evidence properly admitted at trial would be sufficient to sustain a guilty verdict on counts I and II, it is not undisputably so.

In fact, the evidence concerning Christopher's death was in significant dispute. Both Trotter and Tammy stated that they were not in the room when Christopher was fatally injured, and both say that they did not see the other abuse Christopher. In effect, the State's entire case against Trotter was circumstantial in nature since no one testified that they saw Christopher being abused. Whether the jury believed Trotter's statement that he did not commit the crime, as the jury heard in a taped interview with police which was played at trial, or Tammy's testimony at trial that she did not commit the crime was critical to the ultimate verdict. By presenting evidence giving rise to the inference that Trotter was the kind of person who was prone to abuse other people, the State

was able to cast substantial doubt on Trotter's credibility. Faced with such evidence, the jury could have been tempted to infer bad character and action taken in conformity with that character and, thus, could have reached a verdict on an improper basis. See *State v. McManus*, 257 Neb. 1, 594 N.W.2d 623 (1999).

Absent the evidence regarding Trotter's ex-spouses, the jury would have been left with little character evidence other than evidence of Tammy's history with her other children. Evidence was presented at trial tending to show that Tammy had a history of neglecting or mistreating her children. Tammy's mother testified that Tammy voluntarily gave her and her husband guardianship of Tammy's first child, A.C., after A.C. had been removed from Tammy's care when a babysitter noticed marks on A.C. and called the police. Tammy's mother testified that Tammy's second child, K.L., had been living with Tammy and three other people in Otoe, Nebraska, when Tammy left the house one day, thinking there was a babysitter for K.L. The others in the house decided they no longer wanted K.L. with them, and so they called K.L.'s paternal grandparents to come for him. Tammy had a third child before Christopher was born, but gave the child up for adoption at the hospital shortly after giving birth.

In late 1994, Tammy lived with Delmar Robbs and his 3-year-old son, M.R., for a few months in a basement apartment of a house in Omaha, Nebraska. During this time, Robbs was working the night shift at a trucking company installing tires. Robbs testified that he had Tammy watch M.R. while Robbs was at work. While at work one evening, Robbs got a call from the upstairs neighbor, and when Robbs arrived, M.R. had bruises and scratches all over his body. The neighbor testified that she had heard screaming and shouting from the downstairs apartment that evening for approximately 30 minutes. The neighbor banged on the door to the basement apartment, and Tammy eventually came to the door. The neighbor stated that she entered the apartment and discovered Tammy sweating, red faced, and tense and heard Tammy threaten M.R. The neighbor also testified that she did not see M.R.'s injuries the day before when M.R. had come upstairs to visit her. The day after the incident, Robbs had the neighbor babysit M.R. The neighbor then took M.R. to the hospital where photographs were taken of his injuries.

Virginia Childers, Tammy's cousin and the stepdaughter of Tammy's friend, testified that Tammy was at Childers' father's home on a particular occasion and that Childers saw Tammy slap Childers' young stepbrother.

The above evidence, in and of itself, is not sufficient for a jury to conclude that Tammy was responsible for Christopher's death. This type of evidence, however, which was admitted without a rule 404 objection, is sufficient to potentially cast a reasonable doubt whether Trotter was responsible for Christopher's death. On this record, we cannot conclude beyond a reasonable doubt that the improperly admitted evidence did not materially influence the jury in reaching its verdicts on counts I and II. In other words, we cannot conclude with any confidence that the actual guilty verdicts rendered on counts I and II were surely unattributable to the improperly admitted testimony of Trotter's ex-spouses. Therefore, we must reverse the judgment of the district court and the convictions of Trotter on the charges of manslaughter and child abuse resulting in death.

Further, because the State has not raised the issue either at trial or on appeal, we do not comment on whether the evidence of Tammy's past conduct was consistent with rule 404.

### 3. Prior Bad Acts Involving Trotter and Christopher

Having concluded that Trotter is entitled to a new trial with respect to counts I and II, we need not consider the remaining errors assigned by Trotter with the exception of one error relating to count III. Trotter argues that the district court erred in refusing to suppress before trial, and admitting at trial, evidence regarding Trotter's hitting and otherwise abusing Christopher prior to November 1996 under rules 403 and 404 of the Nebraska rules of evidence. At trial, Trotter neither objected to Tammy's testimony that Trotter hit Christopher in the face at 3 o'clock in the morning on one occasion nor objected to her testimony regarding the events surrounding Trotter's discovery of Christopher's tooth. In fact, on direct examination, Trotter's attorney questioned Tammy at length regarding her recollection of the events surrounding Christopher's tooth loss. The failure to object to evidence at trial, even though the evidence was the subject of a previous motion to suppress, waives the objection, and a party

will not be heard to complain of the alleged error on appeal. *State v. Thieszen*, 252 Neb. 208, 560 N.W.2d 800 (1997). One may not waive an error, gamble on a favorable result, and, upon obtaining an unfavorable result, assert the previously waived error. *State v. Bjorklund*, 258 Neb. 432, 604 N.W.2d 169 (2000). Therefore, Trotter's assignment of error regarding the admission of evidence concerning Trotter's prior abuse of Christopher is without merit.

## VI. CONCLUSION

For the foregoing reasons, we conclude that the district court erred in admitting the evidence of prior bad acts relating to Trotter and his ex-spouses. However, the erroneous admission of this evidence was harmless beyond a reasonable doubt with respect to Trotter's conviction on count III—child abuse resulting in serious bodily injury. Therefore, Trotter's conviction on count III and his sentence on count III of 5 to 12 years' imprisonment is affirmed. Because we conclude that the admission of Trotter's ex-spouses' testimony is not harmless beyond a reasonable doubt with respect to counts I and II, we reverse the judgment of the district court and the convictions of Trotter on the charges of manslaughter and child abuse resulting in death and remand the cause for a new trial on counts I and II.

AFFIRMED IN PART, AND IN PART REVERSED
AND REMANDED FOR A NEW TRIAL.