STATE OF NEBRASKA, APPELLEE, V.
ALONZO NEAL, APPELLANT.
658 N.W.2d 694
Filed April 4, 2003.   No. S-02-239.

W. Patrick Dunn for appellant.

Don Stenberg, Attorney General, and Mark D. Raffety for appellee.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, MCCORMACK, and MILLER-LERMAN, JJ.

HENDRY, C.J.

## INTRODUCTION

Alonzo Neal was convicted of first degree murder and use of a deadly weapon in the commission of a felony in the death of Garry Morris. The Douglas County District Court sentenced Neal

to a period of life imprisonment on the first degree murder conviction and a term of 20 years' imprisonment on the use of a deadly weapon conviction. The two sentences were to be served consecutively. The latter sentence was enhanced pursuant to the district court's determination that Neal was a habitual criminal.

## FACTUAL BACKGROUND

At approximately 12:10 a.m. on Monday, January 15, 2001, Officer Larry Bakker of the Omaha Police Department was on routine patrol when he was flagged down by an individual, later identified as Martin Carroll. Carroll informed Bakker that he had just discovered his roommate, Morris, lying in a pool of blood at their apartment. During the subsequent investigation, the Omaha Police Department determined from Carroll that some of Morris' personal property was missing, including Morris' vehicle, a green Ford Focus.

A radio broadcast was put out on the car, which was located and stopped. The driver of the car was identified as Joseph Keyes. Keyes informed the officers who had stopped him that he had received the vehicle from a friend around midnight. There was testimony at trial indicating that the remainder of Morris' personal property was either purchased by Katherinea Hytche and Adrian Page, acquaintances of Neal's, or traded by Neal for drugs. Neal was subsequently arrested, charged, and convicted of first degree murder and use of a deadly weapon to commit a felony.

Dr. Blaine Roffman testified as to his examination and autopsy of Morris. Roffman's external examination noted that Morris had "six deep irregular shaped lacerations that penetrated down to the skull" on the left side of his scalp, and there was some bruising of the skin and abrasions on Morris' left arm. An internal examination of Morris' skull showed two skull fractures, one above the right ear and the other in the midportion of the back of the skull.

Roffman identified the cause of the fractures as blunt trauma, stating that "[i]t would take excessive, significant force to produce a fracture of a skull to this degree. Particularly a depressed skull fracture, to go through the thickness of the skull in those areas and produce those type[s] of fractures would take a great deal of force." Roffman testified that Morris had sustained

between six and eight blows to the head. Roffman further testified that the cause of Morris' death was the two skull fractures in association with the six major lacerations. According to Roffman, these injuries occurred from blunt trauma resulting in brain hemorrhage. Roffman also testified that the wounds indicated Morris was struck from behind, but that if Morris was lower than the attacker and the attacker was standing in front of Morris, it would be possible for the blows to have been struck from above Morris. Finally, Roffman testified that he could not estimate a time of death or which blow Morris received first, but that it was likely that the blows Morris received would have rendered him unconscious.

Several individuals who were involved in the processing of evidence from the crime scene testified. Their testimony disclosed that Neal's fingerprints were found on the toilet tank at the scene and on one of the lamps that was missing from the apartment. There was also testimony indicating that a blood sample from the front door of the apartment, as well as a sample from the floor of the bathroom, matched Neal's blood type.

Neal also testified. On direct examination, Neal described his relationship with Morris prior to Morris' death. He then testified to his version of the events surrounding Morris' death on the evening of Saturday, January 13, 2001. Neal stated that he had called Morris because Morris had offered to make Neal supper. Morris picked Neal up at Neal's sister's home, and together they rented three movies and stopped at a store to purchase food. Neal testified that after they had run those errands, they went to Morris' apartment. While Morris began to make supper, Neal sat down on a chair in Morris' living room and began to watch a movie. According to Neal, Morris also gave Neal a hammer and nail and asked Neal to hang a wall hanging. At some point, Morris came into the living room and lay down on the floor to watch the movie. They later ate supper while continuing to watch the movie. Neal then testified as follows:

[Neal's counsel:] Still drinking?

[Neal:] Well, I'm drunk now really. I done — I done dozed off basically. I dozed off.

Q. While the movie was still on?

A. Yeah.

Q. What's the next thing you remember?

A. I guess I tried to move, I don't know. But I woke up and this dude had my — my — my penis in his hand.

Q. Let me ask you this: Describe when you woke up the position of his body.

[Neal]: Could I show?

[Court]: (The [judge] nods head in the affirmative.)

[Neal]: Like this. I'm like this in the — in the — in the chair (indicating).

Q. . . . . All right.

A. Then he's just like — like this on — like this on me. He was more or less up here like this on me (indicating).

Q. What happened at that point? Did you look at him?

A. No I didn't. Well, yeah, I noticed that, and I just —

Q. What else did you notice?

A. My penis in his hand.

Q. Okay.

A. And I hit him. You know, I hit him, hit him (indicating). When I got up, I stood up this way (indicating).

[Neal]: Is it cool?

[Court]: (The [judge] nods head in the affirmative.)

[Neal]: I stood up this way (indicating), and I pushed up off the table, and whatever I grabbed I started swinging with it.

Neal testified that he continued hitting Morris until something hit him in the face. He then noticed that his hand was bleeding, so he ran to the bathroom where he set the hammer down on the bathroom sink to look for a bandage to stop the blood. Unable to find a bandage, he wrapped a towel around his hand and went into the kitchen to continue his search. He opened a drawer and found a car key, which he took. He then ran out of the apartment, getting about halfway down the stairs before realizing how cold it was and that he did not have his coat or shoes. He returned to the apartment, but the door was locked. Neal stated that he then went to Morris' car to look for a spare apartment key. Finding none, he testified that he used a hook from a wall shelf he found in the trunk of Morris' car to open the locked apartment door. After reentering the apartment, Neal grabbed not only his coat and shoes, but Morris' stereo. Neal then testified that he put the

stereo in the trunk of Morris' car and went back up to the still-open apartment and took Morris' television. Neal also testified that at some point, he took a cellular telephone from Morris' back pocket.

Neal then testified that after he left the scene, driving Morris' car, he exchanged the stereo and television for drugs, which he then smoked at a friend's house. Later that night, remembering he had left the hammer in Morris' bathroom, Neal returned to the scene to retrieve it. Again using the hook to gain entrance, Neal reentered Morris' apartment and grabbed the hammer, which he threw in the sewer. He also stole more of Morris' property, which he then sold to Hytche and Page. The following exchange then took place:

[Neal's counsel:] Do you know, other than the ladies and gentlemen of this jury and myself, is there anyone that you've told what happened inside Garry Morris's apartment?

[Neal:] Yeah, three people.

Q. Who?

A. LaShawn Grant, Neshee (phonetic), I don't know her last name, and a friend of mine, he's dead now, his name is Derrick Brown.

Q. Let's talk about LaShawn Grant and Neshee. When did you talk to them?

A. Well, uh, I think that was Monday. It might have been Tuesday when they showed my face on TV about the car.

Q. What happened?

A. Well, Joseph Keyes, I let him get the car. He wanted to use it for a few, and but I wanted — told him to give it to me at a certain time and he never brought it back to me, and he got caught with the car.

Q. And so sometime after Sunday you talked to Neshee and LaShawn?

A. Yeah.

Q. How did that come about?

A. I was, uh — I'm on the run, really, you know, and I seen — I stopped her and told her I needed a ride. And, uh, she was: What happened, Alonzo, you know, what's going on? She cryin'. And I told her what happened.

Q. What did you tell her?

[State]: Objection; it's hearsay.

[Neal's counsel]: I asked what he told her.

[Court]: What he told her?

[State]: It's hearsay.

[Court]: Overruled. Unless you want to have a sidebar.

[Neal's counsel]: I'll withdraw the question, Judge.

[Court]: Okay.

The record indicates that Neal, Dineshee Thornton, and LaShawn Grant had this conversation on either Monday, January 15, or Tuesday, January 16, 2001. The record further reflects that Neal was arrested on January 23.

On cross-examination, Neal testified:

[State:] So when you wake up, he's holding onto your penis and he's hovering over your penis; is that what you're trying to say?

[Neal:] Yeah, I don't know if he done — if he put it in his mouth already or nothin'. I just noticed this man got my penis in his hand.

. . . .

Q. So you wake up when this is going on, and what's the first thing that you do?

A. I punch him in the face.

Q. All right. With what?

A. My right hand.

Q. And do you know where you hit him in the face?

A. No, I just swung like that (indicating) and at the same time pushing him. And I got up, I leaned to get up, you know, 'cause my foot was on — both my feet was on the stool, and I leaned to get up (indicating).

Q. All right. Did he fall after you hit him in the face?

A. Yeah, he went down like, but he came back up 'cause he outstretched his arm at me.

Q. How many times did you hit him in the face?

A. Just that once when I pushed him up off me that I remember.

. . . .

Q. But you hit him in the face, and then he stands up and puts his hand out at you. What happened then?

A. He didn't stand. He was on his knees like, and when I got him up off me he was like on his knees or something. He was falling like, you know, leaning and he did like this (indicating).

Q. All right. And what did you do?

A. I got up. I'm getting up like this, and I moved around. Like he's facing this way and I'm above him like that (indicating), and —

Q. So you're standing above him?

A. And when I got up, I got up off the table. Like the chair was closer to the table. So when I stepped off of this side of the chair, I first used the table to get up, and I had the hammer in my hand, and —

Q. Go ahead.

A. — and then he — he right here, basically, when I stand up, and I swing and I swing.

Continuing its cross-examination, the State asked Neal:

Q. And once you were arrested in this case, at some point in time you became aware of all of the information through the police reports, the DNA reports, the reports regarding the fingerprints, as to what sort of evidence the police had against you in this case; isn't that right?

A. Well, they said they had fingerprints of mine at the house.

Q. Well, you're aware through the process of discovery and preliminary hearings of what the evidence was in this case; isn't that right?

A. Well, no. That night I got caught I was informed that they . . . had my fingerprints, was the ones that they found at the house.

Following Neal's testimony and after learning of Neal's plans to call Thornton and Grant to testify, the State filed a motion in limine seeking to exclude such evidence. In opposing the State's motion, Neal argued that Thornton and Grant should be permitted to testify pursuant to Neb. Rev. Stat. § 27-801(4)(a)(ii) (Reissue 1995). It was Neal's contention that this testimony was proper to rebut the State's implication that his version of events was fabricated to comport with the forensic evidence found at the scene. After a hearing, the district court, relying upon *State v. Morris*,

251 Neb. 23, 554 N.W.2d 627 (1996), and *State v. Anderson*, 1 Neb. App. 914, 511 N.W.2d 174 (1993), sustained the motion.

An offer of proof was then made, in which both Thornton and Grant testified that shortly after Morris was killed, Thornton and Grant gave Neal a ride. When Grant asked questions relating to Neal's being "on the news," Neal reportedly told both of them that "it didn't happen like that." According to Thornton and Grant, Neal told them he was at Morris' apartment and that when he woke up, Morris was "sucking on his penis so he grabbed something and hit him with it."

During closing arguments, the State pointed out, with regard to Neal's knowledge of the evidence against him:

The defense says, well, we [the State] don't contest everything else that he says. Well, no, that's not true. We contest everything that he says. We know that Alonzo Neal was there that night because the physical and the forensic evidence support that. I don't know about anything else that he says. *There's nothing to corroborate any of that testimony.*

. . . [W]hen we talked about the DNA evidence and the fingerprint evidence, when [Neal was] arrested on January 23rd the police interviewed him. All right? He doesn't know that there's DNA evidence that shows that his blood is in that apartment. He doesn't know at that time that his fingerprints are going to be discovered. And his version of events at that time when he's interviewed by the police as to what's taken place is: I don't know anybody by the name of Garry Morris and Porky [Joseph Keyes] was driving some kind of green car and I saw it that night.

So think about that when he's talking about the credibility of the defendant. So at that point in time it's, well, I don't know what they know. Okay. And I can always say, hey, Porky gave me the stuff from the apartment. Well, Porky gave me the stolen car, or Porky had the car, whatever. Okay. And maybe that's where I'm going to try and work the angle on this thing. But that's his — that's his statement to the police on January 23rd before he knows what the police have got as far as the evidence in this case, before he knows that his blood has been found at that apartment, before he

knows that his fingerprints have been found on these lamps, the lamps and the bathroom on the tank. That's his version. And is that something that is very important when you judge his credibility as a witness? Certainly.

The judge will instruct you about that, any prior inconsistencies that he would have along with a motive not to tell you the truth along with the factor of him having five felony convictions is a factor to consider with regard to his credibility. Very important factors. Because Alonzo Neal has a problem, here, okay?

(Emphasis supplied.)

The jury found Neal guilty of first degree murder and use of a deadly weapon to commit a felony. Neal's motion for a new trial was overruled. This appeal followed.

## ASSIGNMENTS OF ERROR

Neal assigns, rephrased, that the district court erred by (1) refusing to allow him to adduce evidence of his prior consistent out-of-court statement to rebut an express or implied charge of recent fabrication or improper influence or motive, (2) violating due process by refusing to allow him to adduce evidence of his prior consistent out of court statement, and (3) overruling his motion for a new trial.

## STANDARD OF REVIEW

In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is involved only when the rules make such discretion a factor in determining admissibility. *State v. Haltom*, 264 Neb. 976, 653 N.W.2d 232 (2002). When judicial discretion is not a factor in assessing admissibility, the court's application of the Nebraska Evidence Rules will be upheld unless clearly erroneous. *State v. Rieger*, 260 Neb. 519, 618 N.W.2d 619 (2000).

## ANALYSIS

### APPLICABILITY OF § 27-801(4)(a)(ii)

In his first assignment of error, Neal argues that he should have been permitted to call Thornton and Grant to testify concerning statements Neal made to them prior to his arrest

and questioning by the police. He argues that the statements made to Thornton and Grant were prior consistent statements excluded from the definition of hearsay and admissible under § 27-801(4)(a)(ii), which provides:

(4) A statement is not hearsay if:

(a) The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is . . . (ii) consistent with his testimony and is offered to rebut an express or implied charge against him of recent fabrication or improper influence or motive[.]

While this rule has no explicit requirement relating to the timing of prior consistent statements, this court has adopted the reasoning of the U.S. Supreme Court in *Tome v. United States*, 513 U.S. 150, 115 S. Ct. 696, 130 L. Ed. 2d 574 (1995), which concluded that a prior consistent statement must have been made before the motive to fabricate arose in order to be admissible. This court has stated:

In order to minimize the amount of judicial discretion and therefore control the admissibility of evidence by rule as much as possible, we interpret rule 801(4)(a)(ii) to permit the introduction of a declarant's consistent out-of-court statements to rebut a charge of recent fabrication or improper influence or motive only when those statements were made before the charged recent fabrication or improper influence or motive.

*State v. Morris*, 251 Neb. 23, 33-34, 554 N.W.2d 627, 633-34 (1996).

The district court, in rejecting Neal's argument that § 27-801(4)(a)(ii) permitted him to call Thornton and Grant, reasoned that "the statements you're going to offer that the defendant made to those ladies occurred sometime at least hours after this act had occurred, and as such I'm going to sustain the State's motion." Thus, the district court concluded that Neal's motive to fabricate arose at the time the crime was committed and that, therefore, the statements made to Thornton and Grant did not comport with § 27-801(4)(a)(ii). As a result, the district court concluded that § 27-801(4)(a)(ii) was not applicable.

The State does not argue in its brief that Neal was not the declarant of the statements made to Thornton and Grant or that

those statements were not consistent with Neal's trial testimony. See *State v. Roenfeldt*, 241 Neb. 30, 486 N.W.2d 197 (1992). See, also, *U.S. v. Vest*, 842 F.2d 1319 (1st Cir. 1988), *cert. denied* 488 U.S. 965, 109 S. Ct. 489, 102 L. Ed. 2d 526 (holding that trial testimony and out-of-court statements need not be entirely consistent for statement to be considered consistent under this exclusion); G. Michael Fenner, The Hearsay Rule ch. 2B(4) (2003) (citing *Vest, supra*, to suggest that trial testimony and out-of-court statement need not be entirely consistent to fit under exclusion). Further, the record is clear that Neal testified and was subject to cross-examination. Moreover, the record discloses that an implied "charge of recent fabrication or improper influence or motive" was made by the State. As noted previously, during the State's cross-examination, Neal was asked, inter alia:

> And once you were arrested in this case, at some point in time you became aware of all of the information through the police reports, the DNA reports, the reports regarding the fingerprints, as to what sort of evidence the police had against you in this case; isn't that right?

That such question implies Neal fabricated his testimony regarding his motivation for killing Morris becomes inescapable when viewed in context with the State's closing argument as previously set forth.

Having determined the record supports Neal's claim that the State's question implied Neal fabricated his testimony, we now consider the issue of whether the statements made to Thornton and Grant were made "before the charged recent fabrication or improper influence or motive." See *State v. Morris*, 251 Neb. at 34, 554 N.W.2d at 634. As noted previously, the district court determined that any such motive arose at the time the crime was committed, thus the statements were inadmissible. Neal, however, argues that any motive he might have had to fabricate his story in the manner implied by the State would not arise until he had learned of the evidence against him, in other words, after his arrest.

The State's question to Neal on cross-examination implied that he fabricated his motive testimony given the forensic evidence found at the scene. The very nature of such a charge requires that any fabrication could not have occurred until Neal was aware of

the forensic evidence. The record discloses that such knowledge would not have occurred until after Neal's arrest. At the time Neal made his statements to Thornton and Grant, he had not been arrested nor had he given any statement to law enforcement. Accordingly, it is not possible for Neal's motive to fabricate to have arisen prior to the time he made his statements to Thornton and Grant.

We further note that the State, in its brief, does not offer any argument in support of the district court's determination that Neal's motive to fabricate arose at the time the crime was committed. The State instead argues:

> The questions asked by the prosecutor were simple questions concerning the defendant's knowledge of the evidence in this case. The record does not reflect that the prosecutor ever asked the defendant whether he modified his story to "fit" the evidence which appears to be what the defendant is now claiming is implied by these questions. . . . The only thing implied by these questions and answers is that the defendant's knowledge of the evidence possessed by the State was very limited, which could hardly be used to form an argument for the State that the defendant fabricated his testimony to fit the evidence.

Brief for appellee at 11-12.

In support of this argument, the State relies on *State v. Buechler*, 253 Neb. 727, 733, 572 N.W.2d 65, 70 (1998), wherein this court stated that "[a]ttempts at impeachment cannot be equated to charges of recent fabrication." In *Buechler*, the defendant testified on direct examination that he had been threatened by the victim. During cross-examination, the State attempted to impeach this testimony by noting that there was no mention of any threats by the victim in Buechler's recorded confession and also by establishing that the defendant had not realized that his confession was being recorded.

*Buechler* is distinguishable. In *Buechler*, we recognized that it is sometimes difficult to determine whether a question attempts impeachment or "rises to the level of a charge [of] a recent fabrication." 253 Neb. at 733, 572 N.W.2d at 70. We stated that " '[w]e will not find abuse of discretion where, as here, the impeachment is susceptible of either interpretation.' " *Id.*, quoting *Thomas v.*

*U.S.*, 41 F.3d 1109 (7th Cir. 1994). We have no such difficulty in this case. Viewing the State's question in the context of its closing argument convinces us that in this case, it is not "susceptible of either interpretation."

The State's argument further overlooks the fact that § 27-801(4)(a)(ii) provides for both express and implied charges of recent fabrication. While the State is correct in stating that the State's question to Neal never expressly accused him of modifying "his story to 'fit' the evidence," the State's question clearly implied such fabrication. This implication was reinforced during the State's closing argument.

As a result of the foregoing, we hold that the statements made to Thornton and Grant were admissible as prior consistent statements under § 27-801(4)(a)(ii) and that the district court's ruling to the contrary was clearly erroneous. See *State v. Rieger*, 260 Neb. 519, 618 N.W.2d 619 (2000).

### HARMLESS ERROR

Having concluded that the district court erred in not allowing Thornton's and Grant's testimonies to be admitted pursuant to § 27-801(4)(a)(ii), we must now determine whether such error was harmless.

In a jury trial of a criminal case, an erroneous evidentiary ruling results in prejudice to a defendant unless the State demonstrates that the error was harmless beyond a reasonable doubt. *State v. Harrold*, 256 Neb. 829, 593 N.W.2d 299 (1999); *State v. Buechler, supra.*

Harmless error review looks to the basis on which the jury actually rested its verdict; the inquiry is not whether in a trial that occurred without the error a guilty verdict would surely have been rendered, but, rather, whether the actual guilty verdict rendered in the questioned trial was surely unattributable to the error. *State v. Canady*, 263 Neb. 552, 641 N.W.2d 43 (2002); *State v. Trotter*, 262 Neb. 443, 632 N.W.2d 325 (2001).

At trial, Neal did not dispute that he killed Morris, claiming instead that Morris' death was not first degree murder but manslaughter. Neal's claim was that he had fallen asleep in a chair and had awakened to discover his penis had been exposed by Morris; he then stood up, and with Morris below him,

struck him. Such an explanation is not inconsistent with Roffman's testimony:

> [Neal's counsel:] Okay. Did the location of those wounds suggest anything to you —
>
> . . . .
>
> Q. — about the position of the victim's body?
>
> [Roffman:] It would appear he was struck from behind.
>
> Q. Or someone standing over him?
>
> A. More likely from behind. *But unless the individual, the victim, was lower and the person was standing in front over him, that would be also possible.*

(Emphasis supplied.) After Neal presented his version of the events surrounding Morris' death, including his motivation for committing the crime, the State, in cross-examination, implied that this version had been fabricated to meet the forensic evidence discovered at the scene. In response, Neal attempted to introduce his own prior consistent statements, which rebutted the State's implied charge of fabrication and tended to corroborate Neal's story regarding his motivation. The evidence Neal thus sought to introduce went to the very essence of his defense and would be "possible," given Roffman's testimony. As such, we cannot determine the actual guilty verdict was surely unattributable to the error and that as a result, the error was harmless beyond a reasonable doubt. See *State v. Canady, supra.*

### REMAINING ASSIGNMENTS OF ERROR

Since we have concluded that the district court erred in not admitting Thornton's and Grant's testimonies under § 27-801(4)(a)(ii) and that such error was not harmless, we need not consider Neal's remaining assignments of error.

REVERSED AND REMANDED FOR A NEW TRIAL.